THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. LARRY THOMPSON *et al.*, Defendants-Appellees.

Fifth District    No. 5—95—0425

Opinion filed September 10, 1996.—Rehearing denied October 7, 1996.

RARICK, J., dissenting.

Michael Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Robert J. Biderman, and Timothy J. Londrigan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Lawrence J. O'Neill, both of State Appellate Defender's Office, of Mt. Vernon, for appellees.

JUSTICE KUEHN delivered the opinion of the court:

This is a case where a faulty brake light provided a pretext to stop defendants' van. The defective light cloaked the stop's real purpose. The police wanted to confirm uncorroborated information from an anonymous telephone call.

Patrol officers searched for defendants' van after a radio dispatch from headquarters. The dispatch conveyed information received from an unidentified caller. The officers were told that defendants were headed to Carbondale from Carterville with alcohol and guns in their van. Officers located and followed the van because of the dispatched information.

The van was initially discovered on a heading that contradicted the caller's predicted route of travel. In addition, the caller had not clearly informed of criminal conduct. The manner in which the alcohol and guns were being transported was not spelled out.

The Carbondale police possessed uncorroborated and partially discredited information about defendants. The reliability of the information could be measured only by stopping the defendants, searching the van, and finding alcohol and guns. The police followed the van because of their desire to conduct such a search. They were aware, however, of the legal value of the information they possessed. Consequently, they did not stop the defendants until they detected a traffic violation. They waited for a valid excuse to stop the van.

The police effected a traffic stop for driving with a defective right rear brake light. The stop was not motivated by a desire to enforce the rules of the road. It was motivated by the anonymous tip. The police wanted to check the van for evidence of more serious crimes. The police used the faulty brake light as a pretense to put themselves in a position to see if defendants were illegally transporting alcohol and guns.

The traffic stop matured into a series of nonconsensual searches. As a result of those searches, police found and seized two pistols and a bag of marijuana. Defendants were charged with drug and weapons violations. The trial court suppressed the contraband based on the pretextual nature of the stop. The State appeals.

■ We must first decide whether the fourth amendment prohibits pretextual traffic stops. In *People v. Guerrieri*, 194 Ill. App. 3d 497, 551 N.E.2d 767 (1990), *appeal denied*, 132 Ill. 2d 549, 555 N.E.2d 380 (1990), this court defined the standard for testing the legitimacy of a traffic stop motivated by reasons other than enforcement of the Illinois Vehicle Code. We stated:

> "[T]he proper inquiry is *whether a reasonable officer would have made the seizure in the absence of an illegitimate motive.*" (Emphasis added.) *Guerrieri*, 194 Ill. App. 3d at 502, 551 N.E.2d at 770, citing *United States v. Smith*, 799 F.2d 704, 708 (11th Cir. 1986).

This standard for testing the constitutional reasonableness of traffic stops is no longer viable. It has been recently repudiated by the Supreme Court. *Whren v. United States*, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996).

In a unanimous decision, the United States Supreme Court silenced the argument that traffic offenders may challenge probable cause stops generated by hidden reasons unrelated to enforcing the rules of the road. *Whren*, 517 U.S. at 818-19, 135 L. Ed. 2d at 101, 116 S. Ct. at 1777. Ulterior motives do not invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of the law has occurred. *Whren*, 517 U.S. at 813, 135 L. Ed. 2d at 98, 116 S. Ct. at 1774. The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the police officers involved. *Whren*, 517 U.S. at 813, 135 L. Ed. 2d at 98, 116 S. Ct. at 1774.

The defendants operated a van without a working brake light. When this defect was noticed, the police possessed probable cause to believe a traffic law of this state was being violated. Even though the traffic offense masked other reasons for the stop unsupported by probable cause, ulterior motives cannot make otherwise lawful

conduct illegal. The pretextual nature of the stop did not invalidate it. The police had probable cause for the stop. The inquiry ends there.

The trial court's order of suppression rested upon our view of fourth amendment protection in a pretextual traffic stop setting. Our view was wrong. The pretextual nature of the stop was an unsound reason upon which to bar the use of evidence. Clearly, the stop shrouded a desire to search. It was, in truth, no more than a means to reach such an end. Nevertheless, the stop was based on probable cause and, therefore, enjoyed constitutional footing. Conduct that conforms with the Constitution, regardless of the motivation, cannot taint the evidence produced. Only conduct that offends the Constitution need be deterred by suppression of its yield.

The trial court found that but for the anonymous tip, unsupported by probable cause, the stop would not have occurred. It found that the stop was a mere pretext to conduct an exploratory search. The defendants were illegally stopped under the standard set forth in *Guerrieri*. This illegality formed the basis of the suppression order. Therefore, the trial court did not have to focus on reasons tendered to support how and why the traffic stop evolved into a series of searches.

■ The validity of a traffic stop does not automatically afford a reasonable basis to fulfill an underlying ambition to conduct a search. *People v. Day*, 202 Ill. App. 3d 536, 541, 560 N.E.2d 482, 485-86 (1990). Our determination that the initial stop was valid but pretextual does not resolve the legitimacy of the challenged search. Rather, it requires our examination of the record to determine the reasonableness of actions taken after the traffic stop.

The State argues that circumstances after the stop warranted a protective search. The protective search, if valid, produced evidence that provided probable cause to arrest. The arrest, supported by probable cause, allowed incidental search of the van. Although we address this argument in anticipation of its submission to the trial court on remand, we decline the invitation to declare the search valid. Any determination on the legality of the search, on the record presented, would require us to decide issues of credibility.

The hearing on the motion to suppress involved a significant amount of undisputed testimony. The focal point of the search, however, is marked by a sharp contrast in the evidence. The salient circumstances tendered to justify the search diverge in unresolved conflict between the testimony of defendant Mary Thompson and Sergeant Dan Stearns of the Carbondale police department. The facts and circumstances of the search are presented to us as follows.

In the early afternoon of Sunday, August 28, 1994, the Thompson

van, with Larry, Mary, and their 10-year-old son aboard, traveled a path to the Carbondale AutoZone store. The Thompsons wanted to buy a light bulb for their van. The Carbondale police warned the defendants the day before that the van had a defective right rear brake light. The warning was accompanied by a significant delay while a German shepherd and Carbondale officers conducted a search of their van.

Sergeant Dan Stearns (Stearns) conducted a watch meeting with patrolmen on Sunday morning. He told the watch of "rumors" about the Thompsons. He warned patrolmen that the Thompson van might harbor drugs and guns. At approximately noon, via dispatch, Stearns learned of an anonymous call to the department. According to Stearns, the dispatch reported the transport of *alcohol* and guns in the Thompson van. Another officer at the scene, patrolman Wilmore, contradicted Stearns' version of the dispatch. Patrolman Wilmore claimed the dispatch reported transport of *drugs* and guns.

Stearns spotted the van shortly after receiving the radio dispatch. He followed it to the AutoZone parking lot. Larry Thompson exited the van and started to enter the store. Before he could enter, Stearns stopped him. Stearns again advised that the van had an inoperable brake light. Then he attended to the real purpose for the confrontation.

Standing on the parking lot, Stearns related the nature of the anonymous call and told Larry that the van needed to be searched. Larry immediately disavowed the truth of the caller's claim and added that he never drank alcoholic beverages. Stearns responded by conducting a search of Larry's person. Larry had no weapons on him. He was allowed to enter the store. Stearns was in close proximity to Larry throughout this encounter. Stearns was never asked whether he detected any odor of alcohol.

During the encounter on the parking lot, two more Carbondale squad cars arrived in response to Stearns' summons for backup. The squad cars encircled the van.

After Stearns allowed Larry to leave, he did not return to his squad car. He walked around the van to Mary Thompson, who was seated in the front passenger's seat. Stearns explained that he did not return to other duties because of the information he possessed. He returned to the van and its passenger to "follow up" on the anonymous tip.

Only two of the other three officers at the scene testified at the hearing. Patrolman Wilmore testified that the radio dispatch warned that defendants' van potentially harbored *drugs* and guns. Patrolman Baxter testified that Stearns had alerted the watch to "rumors"

about the van. Both officers testified that when they arrived at the scene of the parked van, they knew that other members of their department had searched it less than 24 hours earlier with negative results.

The crucial encounter between Mary Thompson and Sergeant Stearns is in dispute. The evidence consists of two decidedly different versions of the same event.

According to Sergeant Stearns, he left the area of his conversation with Larry Thompson to follow up on the anonymous tip. He approached Mary Thompson, apprised her of the purported information, and told her he needed to search the van. As he told her of his need to search, he saw Mary stuffing something into a duffel bag between her legs. He saw on the console two Hardee's cups containing an "amber colored" liquid. He also saw the blade of a machete knife under the duffel bag.

Stearns could not recall whether he ordered Mary out of the van or whether she exited on her own. In either event, Stearns did not use physical force to remove her from the van. Stearns advised Mary as she was exiting the van that he needed to search her bag. Mary had the bag on her arm and was still trying to stuff something into it. Stearns grabbed the bag, Mary held on, and a struggle ensued. Patrolman Baxter then grabbed Mary, which enabled Stearns to remove the bag from her arm. Stearns searched the bag and found a gun and marijuana. Mary was then arrested.

According to Mary Thompson, two large plastic cups labeled Hardee's were housed in the van's console between the bucket seats. The cups contained iced tea. The machete knife was on the floorboard of the van where it was placed the day before. The Carbondale police had stopped the Thompsons the day before for operating the van on a faulty brake light. Assisted by a German shepherd, they searched the entire van, seized the knife, but returned it in an unsheathed condition before allowing them to leave.

Mary remained in the van with the Thompsons' 10-year-old son while Larry left to enter the store. She saw and heard Stearns' encounter with her husband. When her husband entered the store, Stearns approached her side of the van and opened the door. She was told that the van needed to be searched. Stearns asked for consent to search, which she refused. Stearns then grabbed her arm and pulled her out of the van. He pulled the duffel bag off of her arm and searched it. Thereafter, Stearns had patrolman Edwards handcuff her and take her to his squad car. Mary did not attempt to stuff anything into her bag.

Patrolman Wilmore was outside his squad car, standing near the

rear of the van during the encounter between Dan Stearns and Mary Thompson. He saw Mary pushing Stearns away. He saw her resisting Stearns' efforts to search. Wilmore did not see Mary stuffing anything into the bag.

According to Stearns, patrolman Baxter assisted in retrieving the bag by grabbing Mary Thompson. Patrolman Baxter was obviously close at hand to render such assistance. Indeed, patrolman Baxter saw Mary in the van before she exited. He did not, however, see any furtive movements. He also heard conversation between her and Stearns. However, he was not asked to convey any of the particulars of the conversation. Additionally, he was not asked how Mary exited the van.

According to Mary Thompson, patrolman Edwards handcuffed her after the bag was searched. Patrolman Edwards did not testify. The Thompsons' son did not testify. Both were potentially in position to observe the disputed events.

The State's argument assumes the truth of Stearns' testimony. It ignores the testimony of patrolman Wilmore that the dispatch tracked the rumors discussed earlier that day at the watch meeting. It assumes that an anonymous caller tipped off the transport of alcohol in the van, rather than drugs. Based on Stearns' testimony, the State tenders the following argument. Stearns' approach of Mary Thompson allowed him to corroborate the anonymous tip by observation of the iced tea. The iced tea's amber color led him to suspect that it was beer. Thus, observation of the iced tea gave Stearns reason to credit the caller's prediction that alcohol could be found in the van. If the prediction about alcohol was true, the prediction about guns from the same source could be true as well. The State argues that an articulable suspicion formed. This suspicion, coupled with Mary's furtive conduct toward a duffel bag that rested atop a machete knife, justified a protective search of the bag. The State concludes that Stearns reasonably believed, based on "specific and articulable facts which, taken together with rational inferences from those facts," that Mary Thompson posed a danger to him. See *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968).

In addition to the testimony of patrolman Wilmore, the State's argument ignores the possibility that Stearns opened the door, announced a need to search the van, and then asked permission to do so. It ignores the possibility that, having failed to obtain consent, Stearns pulled Mary from the van and searched her purse, without any furtive conduct on her part. To accept the State's argument, we are required to usurp a function of the trial court to which we routinely defer. Therefore, it is appropriate to remand and allow the

trial court to determine what actually happened. Because this legal issue was not the focus of the original hearing, the trial court should reopen the evidence to afford both parties an opportunity to present further testimony.

We are mindful of a finding in the original suppression order that touched on the absence of testimony justifying a reasonable belief that the officers were in danger. Stearns did not state that his observations and responses were tied to safety considerations. Indeed, on several occasions he testified that his actions after the stop were motivated by a desire to confirm the anonymous tip rather than by a need to conduct a protective search. Nevertheless, if his testimony is accepted, it gives rise to an inference from which the State may legitimately argue that a protective search was warranted. If we are reading the trial court's view too narrowly, if its finding is based upon a broader view of the circumstances and testimony as a whole, the trial court should state its bases for rejecting the State's argument. It should enunciate clearly why it finds that Sergeant Stearns lacked a reasonable belief that his safety was in peril.

■ The standard to be applied is well established. The Constitution permits police to take certain precautions for their own protection. It tolerates limited intrusions on personal security to protect officer safety. *Terry*, 392 U.S. at 21-22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880. If an officer reasonably believes that circumstances after a traffic stop pose a danger, the law allows a limited right to search in the absence of probable cause. *Michigan v. Long*, 463 U.S. 1032, 1049, 77 L. Ed. 2d 1201, 1220, 103 S. Ct. 3469, 3481 (1983). "In evaluating the validity of an officer's *** protective conduct under *Terry*, the '[t]ouchstone *** is always "the *reasonableness in all the circumstances* of the particular governmental invasion of a citizen's personal security." ' " (Emphasis added.) *Long*, 463 U.S. at 1051, 77 L. Ed. 2d at 1221, 103 S. Ct. at 3481-82, quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 54 L. Ed. 2d 331, 335, 98 S. Ct. 330, 332 (1977), quoting *Terry*, 392 U.S. at 19, 20 L. Ed. 2d at 904, 88 S. Ct. at 1878-79. Reasonableness requires analysis of all the circumstances to arrive at a proper balance between public interest and personal privacy. *Mimms*, 434 U.S. at 109, 54 L. Ed. 2d at 336, 98 S. Ct. at 332, citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 614-15, 95 S. Ct. 2574, 2579 (1975). Reasonableness allows leeway for officers to act on less than probable cause when specific and articulable facts raise safety concerns. Reasonableness does not, however, surrender personal security to arbitrary interference by police officers. *Mimms*, 434 U.S. at 109, 54 L. Ed. 2d at 336, 98 S. Ct. at 332, citing *Brignoni-Ponce*, 422 U.S. at 878, 45 L. Ed. 2d at 614-15, 95 S. Ct. at 2579.

This case presents a number of exceptional circumstances, uncommon to other cases where traffic stops evolved into reasonable protective searches. We emphasize that a proper analysis of a protective search necessitates a *Brignoni-Ponce* assessment of the "reasonableness in all the circumstances" involved.

One circumstance sets this case apart from other cases that have validated protective searches made in the course of traffic stops. This was a pretextual stop. We know that the officers stopped the van motivated by a desire to search it. The officers recognized that their information did not afford a reasonable basis to arrest or search. They therefore refrained from stopping the van until they detected a traffic offense. Thereafter, their actions were calculated to develop a legal reason to support a search.

The officers' subjective intent in a pretextual setting cannot make otherwise lawful conduct illegal. It cannot invalidate the stop. It is not, however, totally irrelevant to questions that accompany a pretextual stop. A pretextual stop, by definition, harbors an underlying ambition to exceed its original scope. Once a traffic stop's pretextual nature is established, as it was in this case, we know that the true objective is to find a legal excuse to accomplish a warrantless search. This goal exposes to careful scrutiny disputes over ensuing events.

The Carbondale police might have executed the pretextual stop under circumstances more favorable to the argument that officer safety justified the search. The general conditions surrounding the stop do not favor the use of safety concerns as a justification for the officers' desired agenda. In *Michigan v. Long*, relied upon by the State in support of its position, the Supreme Court analyzed a protective search accompanying a traffic stop. The Michigan officers acted upon observation of a knife inside Long's vehicle. In concluding that the protective search was justified, the Court noted the following circumstances:

> "The hour was late and the area rural. Long was driving his automobile at excessive speed, and his car swerved into a ditch. The officers had to repeat their questions to Long, who appeared to be 'under the influence' of some intoxicant. Long was not frisked until the officers observed that there was a large knife in the interior of the car into which Long was about to reenter." *Long*, 463 U.S. at 1050, 77 L. Ed. 2d at 1220, 103 S. Ct. at 3481.

The Thompsons were stopped on the parking lot of an AutoZone store in Carbondale. It was a Sunday afternoon, and Mary Thompson was seated inside the van with a 10-year-old member of the Thompson family. The stop was not generated in response to egregious conduct. It was generated to find some reason to act upon an unreliable report

and search the van. It was the second stop by the same department for the same offense in less than 24 hours. The first stop was accompanied by a complete search that proved the van to be free of weapons, save the machete knife which was returned. The officers knew of the previous search of the van. The officer who conducted the challenged search repeatedly announced a "need to search," before any observations giving rise to safety concerns could be claimed. This same officer also conducted an unwarranted search of Larry Thompson prior to any observations from which safety concerns could be formed.

There is one additional circumstance atypical to most protective searches made in the course of traffic stops. The officer released the traffic offender. He allowed the offender to leave the scene of the stop. He then focused on the passenger seated in the van, not because of any violation of the law or safety concern, but because of his unreliable anonymous information about the van. Stearns' own testimony assigns his information about the van as the sole motivation for approaching Mary Thompson. Stearns' testimony also belies a reaction to the observations he made on approach to the van. He did not immediately remove Mary Thompson from the van and frisk her. Rather, he explained the telephone call and expressed a need to search the van because of it.

■ Although these circumstances all enter into analysis of the reasonableness of the search, they do not necessarily outweigh one circumstance focal to the question. Stearns may not have been concerned over safety in the initial phase of his encounter with Mary Thompson. In fact, there was very little upon which a concern could be based. A woman rummaging through her handbag while seated in a vehicle awaiting her husband is not necessarily an activity expected to strike fear in the heart of a police sergeant surrounded by three backup officers. This is particularly true on a Sunday afternoon at the AutoZone store with her 10-year-old child seated behind her.

However, Stearns' claim that Mary Thompson continued to reach into the bag as she exited the van is a circumstance capable of causing legitimate safety concerns. Such an act, coupled with her demeanor over another search of the van, could rightfully target the handbag for a precautionary search. The Constitution would not restrain Stearns from preempting her potential retrieval of a weapon from the bag under such circumstance.

Stearns may well have developed a reasonable belief that Mary Thompson posed a threat to officer safety because of her persistent access to the contents of her handbag. This belief may well have been justified despite other circumstances that mitigated against it. Mary

Thompson claims that she did not engage in such activity. In fact, she claims that Sergeant Stearns asked for her permission to search and pulled her from the van when he did not receive it. Obviously, this factual dispute needs to be resolved.

Ultimately, the question turns on what Sergeant Stearns *reasonably* believed. The reasonableness of his belief must be weighed in light of all of the circumstances presented. If he reasonably believed that he was in potential peril, the law allows a limited protective search to assure against it. Such a determination, however, necessitates resolution of certain facts that were left unsettled after the original hearing.

Accordingly, we reverse and remand this case to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

GOLDENHERSH, J., concurs.

JUSTICE RARICK, dissenting:

While I concur with the majority's ultimate resolution regarding the pretextual traffic stop, I cannot agree with the conclusion questioning the probable cause to search Mary Thompson's "handbag." When the officer approached the vehicle to talk to the driver, the officer spotted in plain view two open cups of amber-colored liquid between the two front seats and an unsheathed machete lying on the floor of the passenger side. The female passenger appeared to be stuffing something into a duffle bag which was sitting on top of the machete. At this point the officer justifiably believed that there was support for the anonymous tip and that the female was engaged in furtive movement and suspicious conduct. Such known facts justified a search of both Mary Thompson and the duffle bag she refused to relinquish. See *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983); *People v. Day*, 202 Ill. App. 3d 536, 560 N.E.2d 482 (1990). I therefore see no reason to remand this cause for further proceedings on the issue of the search of Mary Thompson and her "handbag."