847 So.2d 1043 (2003)
Rafael SANCHEZ, Appellant,
v.
STATE of Florida, Appellee.
No. 4D02-1527.
District Court of Appeal of Florida, Fourth District.
May 21, 2003.
Rehearing Denied July 3, 2003.
Marisa Tinkler Mendez of Marisa Tinkler Mendez, P.A., Coral Gables, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Melynda Melear, Assistant Attorney General, West Palm Beach, for appellee.
*1044 STEVENSON, J.
Rafael Sanchez timely appeals his convictions for possession of cocaine, trafficking in cocaine, and possession of a firearm by a convicted felon. Sanchez advances four issues on appeal, all directed to the propriety of the trial court's denial of his motion to suppress. We affirm and write to address only his claims that the traffic stop was simply a pretext and that the length of the stop exceeded what was necessary to issue a traffic citation.

The Evidence at the Suppression Hearing
The evidence at the hearing established that police had received an anonymous tip that Sanchez was transporting cocaine to the north from Miami, via Florida's Turnpike. As a consequence of the tip, police began conducting surveillance on Sanchez's home.
On November 3, 1999, the Miami police followed Sanchez when he did not take his usual route to work, but instead headed north on 1-95. When Sanchez got on the turnpike and headed north, the Miami police requested assistance from other jurisdictions. In order to effect a stop of Sanchez's vehicle, Florida Highway Patrol Troopers Rodriguez, a canine officer, and Greco were called. Rodriguez stated that although he normally works in the Dade County area, on this particular occasion his supervisor requested that he call a Miami detective and work with him. Rodriguez was advised by the Miami detective that they were following a green Suburban that was possibly carrying drugs and was provided with the tag number. Since Rodriguez was so far south, he contacted Trooper Greco.
Greco stated that he was at mile marker sixty-six when he received the call from Rodriguez and that it took him about a half hour to locate Sanchez's vehicle. At the time he spotted Sanchez's vehicle, Trooper Greco was at mile marker 128. Greco testified that he followed the car for a distance and performed a "pace clock," determining that Sanchez was traveling at seventy-eight miles per houreight miles per hour over the posted speed limit. Greco initiated a stop of Sanchez's vehicle.
Greco testified that after Sanchez got out of his car, he informed him that he had been stopped for speeding. Greco described Sanchez as nervous and shaking. When Sanchez provided his driver's license, Greco noticed that the license was restricted to business purposes. Consequently, Greco ran a check on the license and spoke to Sanchez regarding where he was headed and the reasons for his travel. Sometime thereafter, Trooper Rodriguez arrived. Greco could not say how long it took Rodriguez to arrive, but did testify that he was still writing the traffic ticket. Greco acknowledged that he had initially intended to issue Sanchez only a warning, but was persuaded by Rodriguez to issue a citation. According to the time listed on the traffic citation, Greco stopped Sanchez's vehicle at 9:11 a.m.
For his part, Rodriguez testified that during his last conversation with Greco, Greco informed him that he had stopped the vehicle at mile marker 128. Rodriguez testified that he arrived on the scene about five to ten minutes after this conversation. Rodriguez approached Sanchez and asked for permission to search the car. Sanchez agreed and signed a written consent form. The time documented on the consent form was 9:30 a.m. Trooper Rodriguez's dog, Lex, alerted to the right rear of the vehicle. Ultimately, cocaine and a firearm were recovered.
Sanchez testified that he operates a potato processing business and that he was headed north for business reasons. Sanchez confirmed that he was stopped near *1045 mile marker 120-something, but denied that he was speeding. As for the shaking, Sanchez testified that it was cold that day. Sanchez acknowledged that Greco asked him for his license and registration, taking it to his patrol car, and stated that when the officer returned, he questioned him about his destination. According to Sanchez, it was not until some twenty minutes later that the canine officer arrived. Sanchez confirmed that the canine officer had asked for his consent to search the vehicle and that he had said "yes." According to Sanchez, however, he believed that he had no choice in the matter.

The Trial Court's Ruling
The trial court found that Trooper Greco was a credible witness and that the stop had been made because Sanchez was speeding. The court further found that the troopers had probable cause to search the car once the dog alerted, that probable cause was obtained prior to Sanchez's arrest, and that the officers were in the process of issuing a traffic citation. On these facts, the judge denied Sanchez's motion to suppress.

Sanchez's Claim that the Stop was a Pretext
Sanchez spends much of his brief arguing that the traffic stop was simply a pretext and that what the police were really intending to do was stop him because they believed that he was carrying drugs. In Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court decided this issue adversely to Sanchez, holding that the officer's subjective reasons for a stop are not significant and that the question that must be resolved is simply whether there was a reasonable suspicion as to the traffic offense. See also Holland v. State, 696 So.2d 757, 759 (Fla.1997)(adopting Whren's objective standard in Florida).
Sanchez complains that the facts of his case are so egregious as to take them outside of Whren, arguing that police were essentially lying in wait until he committed a traffic infraction. First, we point out that, in deciding Whren, the Supreme Court considered and rejected precisely the type of argument that Sanchez advances here.
It is of course true that in principle every Fourth Amendment case, since it turns upon a "reasonableness" determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause....
Where probable cause has existed, the only cases in which we have found it necessary actually to perform the "balancing" analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interestssuch as, for example, seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body....
Petitioners urge as an extraordinary factor in this case that the "multitude of applicable traffic and equipment regulations" is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop. But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement....

*1046 For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure.
517 U.S. at 817-19, 116 S.Ct. 1769 (citations omitted)(emphasis added).
Second, we note that jurisdictions other than Florida have considered Whren's application under facts similar to those present here. For instance, in Damato v. State, 64 P.3d 700 (Wyo.2003), an officer stopped the defendant at about 3:30 p.m. During the stop, the officer became suspicious because the defendant was nervous, his luggage was in the back seat and not the trunk, there were a lot of fast food wrappers on the floorboard, and the defendant gave inconsistent stories regarding where he had rented the car and where he was going. The officer asked to search the car, but the defendant refused. The officer let him go without issuing a citation.
Then, the officer radioed dispatch and asked that other officers keep an eye out for the defendant, describing his observations and relaying that the defendant had declined to consent to a search. A second officer saw the defendant's car and followed it until he was able to clock the defendant driving seventy-seven miles per hour in a seventy-five mile per hour zone. The Wyoming Supreme Court held that, under the objective standard in Whren, the traffic stop did not violate the Fourth Amendment. See 64 P.3d at 705-06; see also People v. Thompson, 283 Ill.App.3d 796, 219 Ill.Dec. 241, 670 N.E.2d 1129 (1996).

Sanchez's Claim that he was Detained Longer than Necessary to Issue a Traffic Citation
Once a police officer stops a car for a traffic infraction, the officer is then justified in detaining the driver "only for the time reasonably necessary to issue a citation or warning, ..., unless he ha[s] a reasonable suspicion of criminal activity." State v. Moore, 791 So.2d 1246, 1249 (Fla. 1st DCA 2001)(citing Thomas v. State, 614 So.2d 468 (Fla.1993), and Cresswell v. State, 564 So.2d 480 (Fla.1990), among others). Sanchez repeatedly asserts that some twenty to thirty minutes elapsed between Trooper Greco's stop of his vehicle and the canine officer's arrival. According to Sanchez, this was simply longer than necessary for the issuance of a traffic ticket.
Trooper Rodriguez's version of events, however, is that only some five to ten minutes passed. According to Greco, during this time, he obtained Sanchez's license and registration, ran a check on the same, noticed that Sanchez's license was restricted to business purposes, and questioned Sanchez regarding his destination. And, more significantly, Trooper Greco stated that he was still writing the citation when Rodriguez arrived. The judge accepted the troopers' version. Where the police are still in the process of investigating and writing the ticket, the detention is not rendered unreasonable when other law enforcement personnel, including canine officers, converge on the scene. See Sands v. State, 753 So.2d 630, 632 (Fla. 5th DCA 2000)(holding that detention was not unreasonable where only fifteen minutes had passed between the initial stop and the arrival of the canine officer and the officer was still writing the ticket), cert. denied, 531 U.S. 1178, 121 S.Ct. 1155, 148 L.Ed.2d 1016 (2001).
In reaching our decision, we are aware of the Second District's recent decision in Nulph v. State, 838 So.2d 1244 (Fla. 2d DCA 2003). In that case, police had information that Peter Dion was staying at a particular residence and had a large quantity of drugs. The day after receiving the *1047 information, police were conducting surveillance in Dion's neighborhood and, when his car left, they followed. The police ultimately stopped Dion's car for careless driving. Nulph was a passenger in the car.
After determining that Dion was the driver, the officer attempted to locate a canine unit. Since the sheriff's dogs were unavailable, an officer from the City of Winter Haven Police Department assisted. It took the Winter Haven canine officer seventeen minutes to arrive. In the meantime, the officer who initiated the stop ran a driver's license and registration check on Dion and a warrants check on both Dion and Nulph. It took about fifteen minutes for the officer to perform these tasks, and by the time the canine officer arrived, the officer who initiated the stop was standing at the back of his car waiting. In fact, the officer who initiated the stop testified that
I had finished running the warrants checks and everything, and basically I was just standing by and keeping myself organized. I was actually digging out some arrest affidavits from the trunk when he [the canine officer] showed up.
Nulph, 838 So.2d at 1245. The same officer also stated that he had made a conscious decision not to start writing the ticket because he wanted to wait for the canine officer. Ultimately, no citation was issued. On this evidence, the Second District reversed the trial court's order denying Nulph's motion to suppress, finding that the detention was unreasonably long. See id. at 1246.
Nulph is distinguishable from the instant case. There, the officer acknowledged that he had completed running the license and registration checks and was simply waiting for the canine officer. That is simply not the case here. Here, initially Trooper Greco attempted to determine whether appellant was complying with the "business use" only restriction on his driver's license. Then, Greco testified that he was still in the process of writing the ticket when the canine officer arrived. Thus, unlike the situation in Nulph, appellant was not detained longer than necessary to complete the traffic stop for the purpose of waiting for other law enforcement personnel to arrive.
Accordingly, the order denying Sanchez's motion to suppress is AFFIRMED.
HAZOURI and MAY, JJ., concur.