THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY W. LOMAS, Defendant-Appellant.

Fifth District   No. 5—03—0348

Opinion filed June 11, 2004.

Daniel M. Kirwan, Rita K. Peterson, and Elaine M. Belcher, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

James Creason, State's Attorney, of Salem (Norbert J. Goetten, Stephen E. Norris, and Rebecca E. McCormick, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

On December 20, 2002, Tony W. Lomas was traveling the streets of Centralia, Illinois, a passenger in his brother Johnny's car. Two friends of the Lomas brothers, Jeff and Jody, were also along for the ride, as was something that dangled from the car's rearview mirror.

Officer Sean Richards was on patrol that day. He cruised the same Centralia byways traveled by Johnny Lomas and his passengers.

Richards patrolled with a piece of recently received information conveyed to the Centralia police department by some unknown caller. The department learned from an anonymous voice that four men had just made a purchase of Sudafed at the local Wal-Mart store. The dispatcher passed on this anonymous claim to the officers on patrol.

Sometimes, people buy Sudafed to relieve the discomforts of a common cold. It can also be used to make the illegal drug methamphetamine. Would-be drug dealers buy Sudafed in large quantities. The officers who patrolled Centralia's streets that day were familiar with its unlawful uses.

No one knows how Sean Richards linked the foursome in Johnny Lomas's car to the individuals who purportedly purchased Sudafed at the Centralia Wal-Mart. No one bothered to ask him how he made that connection.

Richards did not testify that Johnny Lomas and his three passengers fit a description of the four males who had purchased the Sudafed. Indeed, he did not testify that the unknown tipster even provided a description. Nor did Richards say that the tipster reported how the four males had left the store or whether the tipster described any vehicle in which they had departed. There was no testimony that

the presence of four young men cruising Centralia streets on a winter's day was particularly odd, uncommon, or suspicious.

For some reason that was never made clear, Richards immediately targeted the foursome riding in Johnny Lomas's car for a stop and detention because he somehow believed that they were the four men who had made the Wal-Mart Sudafed purchase.

Richards knew full well that he could not act upon the information that he possessed. There was no way to credit it. Nonetheless, he decided to shadow the Lomas vehicle. Richards candidly admitted that he pursued the Lomas vehicle in order to fulfill his desire to search it, and its occupants, for illegal drugs. He believed, based upon the Sudafed purchase, an event the occurrence of which depended entirely upon the word of an anonymous caller, that a search of Lomas's car would uncover illegal drugs. And so, Richards tailed the vehicle, in order to observe Johnny Lomas's driving. Richards was intent upon conducting a drug investigation. The fulfillment of that desire awaited the observation of Johnny Lomas's breach of some rule of the road. Richards knew that any minor infraction could provide the means to conduct a probe more in line with his true goal, and the curiosity that fed it.

As Richards tailed Johnny Lomas's vehicle, waiting for a reason to legally bring it to a halt, he radioed for assistance. He wanted the assistance to be there when he executed his plan to search the car and its occupants. Three other patrol cars heeded his request and converged upon the area where Richards was following the Lomas automobile. The first patrol officer to find Richards, Officer Stevenson, fell in line behind Richards' squad car and the targeted vehicle. Shortly thereafter, other officers did the same. Soon, four police cars tailed the Lomas vehicle. They loomed behind Johnny Lomas, awaiting that moment when he would grant them a valid reason to stop and detain him.

Finally, Richards saw it. We do not know whether it was an oversized pair of Styrofoam dice, a pair of baby shoes, Mardi Gras beads, a St. Christopher medal, or simply a parking pass. Richards only referred to it as "an object."

Whatever was dangling from the rearview mirror in Johnny Lomas's car provided Richards with the welcomed reason to engage his overheads and bring Johnny Lomas to a halt. It provided the probable cause to seize Lomas and his passengers. It provided a means to the officers' desired end. The four officers were not there to investigate a windshield's partially obstructed view. They were there to probe for illegal drugs during the traffic stop's detention period.

After Lomas was brought to a curbside stop, Richards approached

him. Richards asked for a driver's license and proof of insurance. Thereafter, he asked everyone in the vehicle for some form of identification.

Richards testified that it is routine operating procedure for all Centralia patrol officers to check the validity of registrations and licenses. It is also common practice, even on minor traffic violations, to run a criminal history check on drivers and on all their passengers.

After collecting everyone's identifications, Richards gave them to Stevenson. While Richards examined Lomas's license and proof of insurance, Stevenson took the identifications that Richards had obtained, placed them into his mobile data computer, and ran a criminal history check on everyone. When the computer checked for Tony Lomas, the existence of two prior drug possession convictions popped up.

After the criminal history check was completed, Richards directed Johnny Lomas to step out of the car. Lomas complied. Richards still had Lomas's license and proof of insurance. He had not started to write a citation for anything. Richards did not ask anything about the rearview mirror's decor. He did not ask about the license, the registration, or the proof of insurance. Richards' mind was not on the rules of the road.

Richards immediately turned his attention to the real reason that he had stopped the vehicle. He was interested in finding guns, drugs, or anything else that might constitute illegal contraband. He asked Lomas if he had guns, illegal drugs, or any other kind of contraband in his automobile. When Lomas responded in the negative, Richards asked for permission to check it out for himself. Lomas consented to a search of his car. The Centralia police officers then fulfilled their true objective in stopping the Lomas motor vehicle.

Richards and his fellow officers searched. During the search, they found a small quantity of methamphetamine inside a nylon lunch bag lying on the backseat of the passenger side of the car. None of the officers asked any of the car's occupants about ownership of the lunch bag before it was searched. They apparently assumed that it belonged to Johnny Lomas, the only member of the group of potential owners who consented to the search. See *People v. James*, 163 Ill. 2d 302, 645 N.E.2d 195 (1994) (where the driver lacked the apparent authority to give an effective consent to the search of his companions' belongings).

After the contraband was discovered, Tony Lomas claimed ownership of the bag and the methamphetamine that it contained.

The State charged Tony Lomas (the defendant) with unlawful possession of a controlled substance. After a bench trial on stipulation, the defendant was found guilty and was sentenced to 18 months of imprisonment in the custody of the Department of Corrections.

The defendant appeals the trial judge's denial of his motion to suppress the methamphetamine found inside his nylon lunch bag and his motion to suppress his subsequent admissions as fruit of the poisonous tree.

The trial judge denied the motion to suppress because, in his judgment, the duration of the detention following the stop was not extended beyond what was a necessary detention incident to the traffic stop itself and because the driver of the car had authorized a legal search by way of consent, during this legal detention period.

Initially, we note the unabashed pretextual nature of this traffic stop. In responding to the defendant's claim that Officer Richards "engaged in nothing more than an illegal investigatory detention in the hope he would discover evidence of crimes wholly unrelated to any vehicle code violation," the State incorrectly observes that Officer Richards' subjective intentions in effectuating the traffic stop play no role in the fourth amendment analysis. While it is true that a traffic violation will provide the probable cause to stop and detain, even when officers really have on their minds things other than ensuring lawful driving (see *People v. Thompson*, 283 Ill. App. 3d 796, 670 N.E.2d 1129 (1996)), an obviously pretextual stop is a matter that does have play when courts examine the reasonableness of any search that ensues.

As we pointed out in *People v. Thompson*:

"The validity of a traffic stop does not automatically afford a reasonable basis to fulfill an underlying ambition to conduct a search. [Citation.] Our determination that the initial stop was valid but pretextual does not resolve the legitimacy of the challenged search. Rather, it requires our examination of the record to determine the reasonableness of actions taken after the traffic stop.

The State argues that circumstances after the stop warranted a protective search. ***

\* \* \*

One circumstance sets this case apart from other cases that have validated protective searches made in the course of traffic stops. This was a pretextual stop. We know that the officers stopped the van motivated by a desire to search it. The officers recognized that their information did not afford a reasonable basis to arrest or search. They therefore refrained from stopping the van until they detected a traffic offense. Thereafter, their actions were calculated to develop a legal reason to support a search.

The officers' subjective intent in a pretextual setting cannot make otherwise lawful conduct illegal. It cannot invalidate the stop. *It is not, however, totally irrelevant to questions that ac-*

*company a pretextual stop*. A pretextual stop, by definition, harbors an underlying ambition to exceed its original scope. Once a traffic stop's pretextual nature is established, as it was in this case, *we know that the true objective is to find a legal excuse to accomplish a warrantless search. This goal exposes to careful scrutiny disputes over ensuing events*." (Emphasis added.) *Thompson*, 283 Ill. App. 3d at 799, 804, 670 N.E.2d at 1131, 1134.

■ The open use of traffic laws as sheer pretense in order to fulfill an ambition to detain someone, and in order to conduct a warrantless search during that detention, is a factor to be weighed when testimony diverges over how events unfolded and led to an inevitable search of the motor vehicle. In weighing factual disputes over what happens after an obvious pretextual traffic stop, trial judges should be mindful of the officers' true purpose in making the stop, when they consider inconsistencies over the length of the detention and disputes over the events that led to the ultimate search.

Here, however, no one disputes the basic facts. Nor is there any question over witness credibility. In cases like the one before us, we review a decision to deny a suppression motion without deference to the trial judge's determination. *People v. Bunch*, 207 Ill. 2d 7, 13, 796 N.E.2d 1024, 1028-29 (2003).

The State questions the defendant's standing to complain about the consensual search of his brother's car. It correctly points out that "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *United States v. Salvucci*, 448 U.S. 83, 85, 65 L. Ed. 2d 619, 623, 100 S. Ct. 2547, 2549 (1980).

This is a sound proposition that the State simply misapplies in this case. The State fails to understand that this defendant is not attempting to avail himself of his brother's fourth amendment freedoms. The defendant is asserting that his own liberty was infringed as an occupant of a vehicle that was stopped by the police. He seeks the vindication of his own liberty interests—the vindication of his right to be free from an unreasonable seizure of his person.

■ The temporary detention of individuals—passengers and drivers—during a vehicle stop constitutes a "seizure" of "persons" within the meaning of the fourth amendment. *People v. Gonzalez*, 204 Ill. 2d 220, 225, 789 N.E.2d 260, 264 (2003). In recognition of this fact, the Illinois Supreme Court has repeatedly held that passengers have standing to challenge the illegal seizure of a vehicle in which they are riding. *People v. Harris*, 207 Ill. 2d 515, 525, 802 N.E.2d 219, 226 (2003); *Bunch*, 207 Ill. 2d at 13, 796 N.E.2d at 1029.

■ Vehicle stops must be reasonable seizures that comport with

the fourth amendment's call for reasonableness. U.S. Const., amend. IV. The reasonableness of a traffic stop is measured by the criteria set forth in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In determining whether a valid *Terry* stop has occurred, we engage in a two-part inquiry. First, we must determine whether the officer's actions were justified at their inception. If so, we must further examine whether subsequent actions were reasonably related in scope to the circumstances that justified official interference in the first place. *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270.

Where an officer's detention of a person exceeds his authority under *Terry v. Ohio*, a subsequent consent to search can be tainted by that illegality. *People v. White*, 331 Ill. App. 3d 22, 34-35, 770 N.E.2d 261, 272 (2002).

■ The Illinois Supreme Court has provided us with instructions on how to examine police questioning during a traffic stop, in order to determine whether the questioning is reasonably related in scope to that stop:

> "[W]e must consider, as an initial matter, whether the question is related to the initial justification for the stop. If the question is reasonably related to the purpose of the stop, no fourth amendment violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no fourth amendment violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270.

Relying upon *People v. Gonzalez*, we recently held that questioning an individual about the contents of his car during a traffic stop exceeded the permissible scope of the stop. *People v. Leigh*, 341 Ill. App. 3d 492, 494, 792 N.E.2d 809, 811 (2003).

On the night of May 23, 1999, Thomas Leigh was accompanying his wife to the store for the purpose of buying milk. *Leigh*, 341 Ill. App. 3d at 493, 792 N.E.2d at 810. Patrolman Dennis Hout noticed that Leigh was driving his pickup truck without a rear license illumination light. Hout engaged his overheads and pulled Leigh over. Hout obtained Leigh's license, registration, and proof of insurance, and he returned to his squad car to run everything in the dispatch computer. Shortly thereafter, he learned that the license and registration were valid. He also learned that Leigh had been convicted of criminal damage to property in 1984.

Officer Hout returned to the pickup truck and directed Leigh to get out of it and to accompany him to his squad car. As Hout finished writing a warning ticket for the failure to illuminate his registration, he asked Leigh if there was anything inside the truck that a police dog "would hit on." Leigh told Hout that his wife, Traci, had her pistol inside the truck.

Hout seized the pistol. *Leigh*, 341 Ill. App. 3d at 494, 792 N.E.2d at 811. A successful prosecution for unlawful possession of a firearm by a felon ensued. Thomas Leigh appealed the trial judge's denial of his motion to suppress. He contended that Officer Hout had impermissibly exceeded the scope of the initial stop in violation of Leigh's fourth amendment rights.

Using the roadmap set forth in *People v. Gonzalez*, we found that Officer Hout's question was unrelated to the purpose of the stop and was asked without a reasonable, articulable suspicion. *Leigh*, 341 Ill. App. 3d at 496, 792 N.E.2d at 813. We held that the question changed the fundamental nature of the stop from a warning ticket for a minor traffic offense to an all-encompassing probe into illegal criminal activity. The question expanded the scope of the stop from an initial inquiry about a motor vehicle violation into an open-ended investigation about illegal contraband.

■ When we turn to the facts before us in this case, it is far clearer that Officer Richards' detention of Johnny Lomas and the occupants of his car had nothing to do with the initial stop. Indeed, Richards readily admitted that the stop and detention was never about Johnny Lomas's obstructed view of traffic. The stop and detention was entirely about the anonymous tip and Richards' desire to search for illegal drugs because of it. Clearly, the anonymous tip did not provide enough detail to be able to credit it. And without knowledge about the reliability of its source, the information could never validate an investigatory stop to inquire about illegal drugs. It is questionable whether the information itself could even give rise to a reasonable suspicion, because Sudafed is a legal over-the-counter medication. Richards did not testify that the unknown caller mentioned an inordinately large purchase that might discount its valid use and suggest that it was being purchased as an ingredient for methamphetamine production.

The officers surely knew that the tip did not provide them with enough information to make a valid investigatory stop. They followed the Lomas vehicle for some time, knowing that they needed a traffic violation to make a valid, albeit pretextual, stop.

The admitted pretextual nature of the traffic stop in this case underscores the kind of constitutional protection the Illinois Supreme Court has recently fashioned and refined for people subjected to valid

traffic stops made with ulterior motives. See *People v. Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556 (1999); *Harris*, 207 Ill. 2d 515, 802 N.E.2d 219; *Bunch*, 207 Ill. 2d 7, 796 N.E.2d 1024; *Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260; *People v. Cox*, 202 Ill. 2d 462, 782 N.E.2d 275 (2002).

Law enforcement officers have come to understand that they can have ulterior investigatory motives in stopping motor vehicles as long as they have the probable cause to believe that a traffic violation has occurred. *Thompson*, 283 Ill. App. 3d 796, 670 N.E.2d 1129; *Whren v. United States*, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996). As this case so graphically demonstrates, officers are no longer the slightest bit duplicitous about minor traffic stops initiated for the purpose of making probes into the possible possession of contraband. However, the recent development of cases that scrutinize traffic stops with a view toward questioning whether the fundamental nature of the stop strays from the enforcement of traffic laws into investigatory inquiries about other criminal activity constrains valid traffic stops engaged in as pretexts for invalid roadside fishing expeditions to uncover illegal contraband. If officers want to engage in a pretextual traffic stop, they may constitutionally do so. *Whren*, 517 U.S. at 813, 135 L. Ed. 2d at 98, 116 S. Ct. at 1774. However, the probable cause that they possess is all that justifies subsequent detentions. And unless the officers possess, or subsequently develop, reasonable, articulable suspicions that some kind of other criminal activity is afoot, they must attend to the business of charging a traffic offense and confine their investigation to the minimal inquiries attendant to it. Any questioning about the possession of contraband during the traffic stop detention quite obviously changes the fundamental nature of the stop.

Officer Richards candidly admitted that the traffic stop was a total ruse, in order to search based upon the anonymous tip. He summoned three other officers before he could find a traffic violation to justify a stop and detention. He further testified that he was not about to write a ticket for that traffic violation until he had sought permission to search for evidence of drugs.

The State maintains that Officer Richards and his cohorts had a reasonable, articulable suspicion that the car's occupants either possessed methamphetamine or were about to manufacture it. It points out that Richards knew that four males had just been to Wal-Mart and had just purchased Sudafed, a legal, over-the-counter drug that can be used to manufacture methamphetamine. The State combines this knowledge with two other circumstances to arrive at the position that Richards had a reasonable, articulable suspicion when he strayed from writing a traffic ticket and embarked upon his true purpose for the stop—his quest to search for illegal drugs. First, Richards found out

that one of the occupants of the stopped vehicle had two prior drug convictions. Second, Richards testified that the quantity of the Sudafed purchased heightened his belief that it had been purchased for methamphetamine production.

The State's reliance upon testimony that the quantity of the purchase contributed to a reasonable, articulable suspicion is misplaced. The State concedes that the quantity of Sudafed that was actually purchased by the four males at Wal-Mart is completely unknown. Officer Richards did not say that the anonymous tipster told him how much Sudafed had been purchased.

This was Richards' testimony about the anonymous tip:

"We received a call from Wal-Mart stating that there were four males inside buying Sudafed."

Even assuming that Richards construed this to mean that there were four males in Wal-Mart and that all four were buying Sudafed, which is not entirely clear from the testimony, the total quantity of the purchase is still a mystery. We assume that Sudafed comes in different size packages. A suspicion that the defendant was about to manufacture methamphetamine would hardly be reasonable without more information about the amount of Sudafed purchased.

We cannot presume that the quantity of Sudafed purchased would contribute to a reasonable, articulable suspicion that the Sudafed was being purchased for the production of methamphetamine, when the record provides absolutely no indication of what amount was actually purchased. The State argues the existence of a reasonable suspicion based upon pure speculation, without any specific and articulable facts in the record to support the inferences it wants us to draw.

There simply was never a reasonable, articulable suspicion to believe that any occupant of the car had committed, was committing, or was about to commit a criminal offense. Significantly, the State's argument hinges upon the false assumption that the anonymous information that Richards possessed was information about the defendant and his friends. There is nothing in this record to reasonably link the anonymous information to the foursome riding in Johnny Lomas's car. Presumably, Richards could not articulate facts that drew him to suspect that Lomas and his passengers were the same four men who had made the Wal-Mart Sudafed purchase. The only connection that we can decipher is a like sex and a like number of fellow travelers. Absent more information identifying the defendant and his companions as the reported Wal-Mart customers, it cannot be said that the suspicion was reasonable.

Coupling the anonymous information to the postdetention acquisition of information about the defendant's criminal record assumes

that Richards could articulate how he tied the tipster's knowledge to the defendant, which is something he apparently could not do. Richards lacked a reasonable, articulable suspicion even after Officer Stevenson retrieved the defendant's criminal history out of his mobile data computer, for he lacked sound reason to believe that the defendant was one of the recent Sudafed purchasers.

As to the defendant—a passenger caught up in a traffic stop and detention that was being used as a fishing expedition into other criminal activity—the fundamental nature of this stop changed, and the detention therefore became illegal, before any of the officers learned of his criminal history. See *Harris*, 207 Ill. 2d 515, 802 N.E.2d 219 (where warrant checks conducted on a passenger's identification changed the fundamental nature of a minor traffic stop and exceeded the scope of the initial detention in violation of the fourth amendment).

The State points out that even if Richards did not have a reasonable suspicion to run a warrant check on the defendant, the warrant check did not prolong the duration of the stop and was therefore permissible. This was what the trial judge deemed determinative. However, whether the warrant check prolonged the detention's duration is not the only inquiry. As the Illinois Supreme Court has made clear:

"In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether *** the question impermissibly prolonged the detention *or changed the fundamental nature of the stop.*" (Emphasis added.) *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270.

The Illinois Supreme Court has determined that running a criminal history check on the passenger of a motor vehicle changes the basic nature of the stop from ticketing a minor traffic offender into a general probe of the passenger's criminality, or lack thereof. *Harris*, 207 Ill. 2d at 528, 802 N.E.2d at 228. Officers are no longer detaining the passenger to effectuate his or her driver's traffic ticket but are using the passenger's detention to conduct a much broader type of investigation into the passenger himself. That is precisely what happened here.

Finally, the State urges us to find that the contraband is still admissible, even if the warrant check was impermissible under *People v. Harris*. It argues that the methamphetamine would have been found regardless of the officers' violation. Johnny Lomas's insurance had lapsed and he was ticketed because of it. The State maintains that the police would have taken him into custody, conducted an inventory search of his automobile, and inevitably discovered the methamphetamine that the illegal detention had produced.

The inevitable-discovery doctrine permits the admission of evidence obtained in violation of a citizen's constitutional rights if the prosecution can show that the evidence would inevitably have been discovered without the constitutional violation. *People v. Edwards*, 144 Ill. 2d 108, 142, 579 N.E.2d 336, 349 (1991).

While the possibility of a valid inventory search certainly existed and such a search may have uncovered the methamphetamine, we hardly think such an outcome was inevitable. There are other potential outcomes that appear to be more reasonable under the circumstances. We doubt that the defendant would have wanted to remain with the car during the inventory search. We further doubt that he would have left his belongings in the car, particularly the nylon lunch bag that contained illegal contraband. Speculation and assumption will not support the application of the inevitable-discovery doctrine, and the State's argument here is highly speculative. See *Harris*, 207 Ill. 2d at 533, 802 N.E.2d at 230.

The questioning of the defendant and the questioning of the driver who caused the defendant's traffic stop detention were unrelated to the stop. The questions were tendered at a time when the officers lacked a reasonable, articulable suspicion that warranted questions about the possession of guns, illegal drugs, or any other form of contraband. The questions posed evinced a fundamental change in the nature of the stop, from a stop and detention for a minor traffic violation into a detention for the purpose of an open-ended probe designed to satisfy official curiosity about the existence of illegal drugs inside the car or on the person of any of its four occupants. Therefore, we find that the defendant's detention impermissibly exceeded the scope of the initial traffic stop and became an illegal detention in violation of the defendant's fourth amendment freedoms at that point in time when the focus of the officers shifted from enforcing a law that requires motor vehicle operators to maintain a clear and unobstructed view outside of their vehicles into a fishing expedition about other kinds of potential criminality.

Thus, we hold that the defendant had standing to challenge the validity of his illegal detention. We further hold that the consent which ultimately led to the search of this defendant's personal belongings was given at a time when the defendant was being illegally detained. The consent was tainted by that illegality. It could not validate the search.

Accordingly, we reverse the trial judge's rulings on the motion to suppress. The methamphetamine that formed the basis of this prosecution was discovered in violation of our constitution's promise of freedom from unreasonable search and seizure. The contraband and

the admissions that flowed from its discovery should have been suppressed as products of an unconstitutional search and seizure. We reverse the conviction obtained by use of the tainted evidence.

For the foregoing reasons, the judgment of the circuit court of Marion County is hereby reversed.

Reversed.

WELCH and DONOVAN, JJ., concur.