985 So.2d 1170 (2008)
William Joseph NAPOLEON, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 1D07-3035.
District Court of Appeal of Florida, First District.
June 30, 2008.
*1171 Nancy Daniels, Public Defender, M.J. Lord, Assistant Public Defender, Office of the Public Defender, Tallahassee, for Appellant.
*1172 Bill McCollum, Attorney General, Jennifer J. Moore, Assistant Attorney General, Office of the Attorney General, Tallahassee, for Appellee.
PER CURIAM.
William Joseph Napoleon, Jr., appeals his judgment and conviction for crimes associated with possession of a firearm, contending that the trial court erred by denying his motion to suppress. We reverse and remand.
Okaloosa County Sheriff's Deputy Steven Weyer pulled a vehicle over for cutting suddenly in front of his vehicle and for an inoperative license-plate light. He approached the vehicle and saw two females in front and three males in back, one of whom was appellant Napoleon. Deputy Weyer observed tattoos on Napoleon's cheeks of the state of California and the state of Florida, and that two of the men in the back seat were wearing matching bandannas and clothing, which raised his concern about "possible gang activity." He asked for everyone's i.d.'s, and noticed that the three in the back weren't wearing seat belts although some appeared to be under 18.[1] None of the men had i.d.
Weyer said they were all "extremely nervous" and uneasy, and that he'd had previous experience with the driver "dealing with felony narcotics which goes along hand in hand with gang activity." At that point, which was 9:32 p.m., he worried about his security, because he was alone on a "dark, lonely road" with possible gang members "outnumbered five to one." Deputy Weyer said he wanted to conduct field interviews of the occupants to determine whether they were gang members, and he didn't want to conduct the interviews, write out a citation, or walk his canine around the car until he had backup, so he called a street-crimes unit. After two or three officers arrived, Weyer walked his dog around the car, which took about a minute, and the dog indicated a narcotic odor in the car, so at 9:50, Weyer detained the vehicle occupants for a narcotics investigation. The officers found marijuana, scales, and baggies, and Napoleon was carrying a firearm and crack cocaine. Deputy Weyer never did issue a citation to the driver.
This court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the determination of the trial court. Application of the law to the facts is reviewed de novo. Pagan v. State, 830 So.2d 792, 806 (Fla. 2002). The state claims this case involved only a traffic stop with no additional detention. Because Deputy Weyer never issued a citation to the driver, the occupants' detention for 20 minutes after the initial traffic stop did not occur within the context of the traffic stop but instead required a founded suspicion of articulable criminal activity, which was not shown. Accordingly, the trial court erred by denying Napoleon's motion to suppress.
When a driver is stopped for a traffic infraction and there is no suspicion of criminal activity, the officer may detain the occupants no longer than the time it takes to write a citation. See Ill. v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005); Hines v. State, 737 So.2d 1182, 1185 (Fla. 1st DCA 1999). Use of a narcotics dog to sniff a vehicle does not constitute a search or seizure, and may be conducted during a consensual encounter or traffic stop. See Caballes at 408-09, 125 S.Ct. 834; Holden v. State, 877 So.2d 800, 802 (Fla. 5th DCA 2004). Accordingly, when an officer is still writing a *1173 citation during a traffic stop when a backup officer or canine unit arrives, the lapse of time is generally not unreasonable. See, e.g., Sanchez v. State, 847 So.2d 1043 (Fla. 4th DCA 2003); Sands v. State, 753 So.2d 630 (Fla. 5th DCA 2000).
In contrast, in Sparks v. State, 842 So.2d 876 (Fla. 2d DCA 2003), the deputy had finished writing a citation for driving with a broken headlight before the canine unit arrived twenty minutes after the initial stop, and the officer had neither given Sparks the citation nor told him he could go. "Accordingly, the time between the completion of the writing of the citation and the arrival of the canine unit was an illegal detention." Id. at 877. In Williams v. State, 869 So.2d 750 (Fla. 5th DCA 2004), an officer stopped Williams for a traffic violation and issued a citation 35 minutes later, then conducted a dog sweep, leading to Williams' arrest. The court found the time to be unreasonably long, and even if it had been reasonable, the officer issued the citation before commencing the dog sniff, rendering the detention for the sniff illegal.
In a comparable case, Nulph v. State, 838 So.2d 1244 (Fla. 2d DCA 2003), the officer pulled driver Peter Dion over for careless driving and called in a canine unit because he suspected Dion of drug activity. Candice Nulph was a passenger. The officer took 15 minutes to run the license, registration, and warrant checks on Dion, which were negative, and then busied himself until the canine unit arrived two minutes later. The stop had by then lasted 20 minutes. "The detective testified that he had made a conscious decision not to start writing a citation because he wanted to first wait for Officer Taylor." Id. at 1246. The canine found drugs on Nulph. The officer never did issue a citation to Dion. The court concluded that the detective detained the vehicle "based on a suspicion of drug possession rather than for the issuance of a citation for a traffic infraction," which was improper because the officer had no founded suspicion that Dion or Nulph had committed, were committing, or would commit a crime. Id. at 1245-46. "Although we cannot say that the detention was unreasonably long had the detective decided at the outset to issue a citation, that is not what occurred." Id. at 1246.
Similarly, in the case at bar, Deputy Weyer said he waited for backup in order to write a citation, but he never did issue one. The evidence shows that what he really intended was to detain the occupants until he could conduct the dog sniff and field interview the possible gang members.[2] Because the traffic stop had evolved into an investigatory stop, Weyer needed a founded suspicion of criminal activity to detain the vehicle. See Morrow v. State, 848 So.2d 1290 (Fla. 2d DCA 2003).
The second level of police-citizen encounter is reached when there is a reasonable or founded suspicion that criminal activity may be afoot (that the person has committed, is committing, or is about to commit a crime), whereupon a person may be detained and the consensual encounter, traffic stop, or field interview becomes an investigatory stop. See Golphin v. State, 945 So.2d 1174, 1180 (Fla.2006), cert. denied, ___ U.S. ___, 128 S.Ct. 40, 169 *1174 L.Ed.2d 11 (2007); Beckham v. State, 934 So.2d 681, 683 (Fla. 2d DCA 2006). The officer must have an objective and particularized basis for the detention, rather than an inchoate suspicion or hunch. See Tillman v. State, 934 So.2d 1263, 1273 (Fla. 2006). Behavior that is merely "suspicious but not demonstrably or conceivably criminal" does not constitute founded suspicion for an investigatory stop. See, e.g., Hills v. State, 629 So.2d 152, 156 (Fla. 1st DCA 1993). Whether the officer had reasonable suspicion depends upon the totality of the circumstances in light of the officer's background and experience, and may include an evaluation of the physical appearance and behavior of the individual. See Moore v. State, 561 So.2d 625, 626 (Fla. 1st DCA 1990); State v. Russell, 659 So.2d 465, 467-68 (Fla. 3d DCA 1995).
Deputy Weyer's suspicion regarding gang activity was a hunch at best. He said two of the men in the back seat had matching clothing and bandannas, which are associated with gangs in general, but did not elaborate upon this observation at all. He did not say Napoleon's tattoos were a gang insignia. No one from the backup unit testified about the indicia of gang membership in Okaloosa County. See Baggett v. State, 531 So.2d 1028, 1030 (Fla. 1st DCA 1988) (officer's testimony that he stopped the defendant because it was 1:45 a.m., he was walking in an area of recent break-ins, he acted nervous, he was wearing dark clothing, and he looked young and could have been a runaway, did not support an investigatory stop and frisk, when "the record contains no evidence of objective facts that indicate Baggett was a runaway" and the other reasons were legally insufficient). The driver's prior drug activity did not provide a well-founded suspicion of gang activity. See Beckham, 934 So.2d at 684.
The cases the state cites to support the 20-minute delay did not involve traffic stops or consensual encounters but instead investigatory detentions, which may extend for a reasonable time necessary to obtain a narcotics dog. See U.S. v. Hardy, 855 F.2d 753 (11th Cir.1988); Cresswell v. State, 564 So.2d 480 (Fla.1990); Rogers v. State, 586 So.2d 1148 (Fla. 2d DCA 1991). As shown above, the state did not establish the facts necessary to support a founded suspicion for an investigatory detention.
REVERSED and REMANDED with directions to the trial court to grant the motion to suppress.
BARFIELD, VAN NORTWICK, and PADOVANO, JJ., concur.
NOTES
[1] Napoleon was 24.
[2] A field interview is a consensual encounter consisting of police questioning to obtain information but involving no restraint or detention. See, e.g., Golphin v. State, 945 So.2d 1174, 1180 (Fla.2006), cert. denied, ___ U.S. ___, 128 S.Ct. 40, 169 L.Ed.2d 11 (2007); Bordelon v. State, 908 So.2d 543, 544 (Fla. 1st DCA 2005); State v. Suggs, 765 So.2d 267, 268 (Fla. 1st DCA 2000). It would be a contradiction in terms to permit an officer to detain individuals until backup arrived in order to conduct a consensual encounter.