881 So.2d 1185 (2004)
Charles BARR, Appellant,
v.
STATE of Florida, Appellee.
No. 1D03-3224.
District Court of Appeal of Florida, First District.
August 30, 2004.
Rehearing Denied September 21, 2004.
Nancy A. Daniels, Public Defender; M. Gene Stephens, Assistant Public Defender, and Glenna Joyce Reeves, Assistant Public Defender, Tallahassee, for Appellant.
Charlie Crist, Attorney General; Charlie McCoy, Senior Assistant Attorney General, Tallahassee, for Appellee.
BENTON, J.
On direct appeal of his conviction for sale or delivery of cocaine, Charles Barr contends that the trial court erred in precluding cross-examination about the "takedown signal" which allegedly led to his arrest. We reverse and remand for a new trial at which any State's witness testifying that a "takedown signal" was given because a sale of crack cocaine took place can be fully cross-examined on the point.
Mr. Barr stood trial on charges of selling or delivering a rock of crack cocaine to Walter Cullen, an undercover narcotics detective, while they were in the front seat of a car. At the time, Detective Cullen testified on direct, he was engaged in a "buy-bust operation" in which "takedown units" moved in and arrested citizens, but only after he had consummated the purchase of an illegal drug, and communicated the fact by using a concealed microphone to give the "takedown signal"  a codeword agreed upon beforehand to signify that an illegal sale had taken place, and that the seller should be arrested.
The jury heard conflicting versions of events. But there was no dispute that, posing as a construction worker at a nearby site, Detective Cullen told Mr. Barr, to whom he called from the car he was in, that he was interested in sixty dollars' worth of cocaine; then said he would entrust him with twenty dollars to start with "because I don't know you," and that he would give him the remaining forty dollars if he brought cocaine back.
Detective Cullen testified that, after he gave Mr. Barr twenty dollars, Mr. Barr disappeared from sight on foot before returning, getting in the car, and directing *1186 Detective Cullen to "take off." Detective Cullen also testified: As he started to drive away, Mr. Barr handed him a piece of crack cocaine, whereupon Detective Cullen uttered the takedown signal. Before any takedown unit responded to the takedown signal, however, again according to Detective Cullen, he saw a car containing a takedown unit (two police officers) parked on the side of the street and pulled his car in front of theirs. Thereupon, the detective further testified, the takedown unit officers emerged from their vehicle, approached Detective Cullen's car, pulled Mr. Barr out of the car, and handcuffed him.
On the other hand, Mr. Barr denied the sale or delivery of any crack cocaine. He testified that he took the twenty dollars from Detective Cullen, walked out of sight, and hid the money. (The money was never recovered.) Mr. Barr testified that he came back and got into the car, not intending to hand over any cocaine, but with the intention of directing Detective Cullen around a corner where he intended to take the rest of the money and run down an alley with it. Before Mr. Barr could carry out this plan, he testified, Detective Cullen pulled in and parked in front of the takedown team, who got out of their car and arrested him.
The microphone concealed on Detective Cullen's person picked up what was said beginning before Mr. Barr got into the car and ending after he was arrested. A recording was made on audiotape, which came in evidence. At trial, Detective Cullen testified on direct examination, "After he gave me the piece of crack cocaine, I gave the takedown signal letting the takedown units know that the transaction had taken place, that I did have the crack cocaine." On cross-examination, defense counsel sought to ascertain what the takedown signal was, in order to permit the jury to decide for themselves whether it was on the audiotape. But the trial judge cut off this line of inquiry ex mero motu:
Q Now what's the takedown signal?
A It is a predetermined word we use.
Q What's the takedown signal in this case?
The Court: Hold on. Hold on. I am not going to require him to give a takedown signal, Mr. 
Mr. Shirk [Defense counsel]: I think it's important to know on this tape where it is he gave the takedown signal. It goes toward our defense.
The Court: I am not going to require he give out the takedown signal at this point.
The trial judge did not allow cross-examination or other inquiry about the takedown signal at any later point either, but did elaborate on his rationale for keeping the takedown signal a secret in a colloquy with defense counsel:
I'm still not understanding why it matters what the takedown signal is ... as opposed to when. I think it's pretty clear the takedown signal was given after Mr. Barr  after he got back in the car and before he was arrested. That to me gives the defense sufficient ground to argue whatever you are going to argue just precisely what it is. It's my analysis it's dangerous  the takedown signal is pretty much the same throughout the city. If it is disclosed now, it would be all over the city tonight and there wouldn't be enough time to change it. I just don't see  I haven't been able to see the importance of what the takedown signal [was]. That's the reason I prohibited it.
Mr. Shirk: Your Honor, that's assuming the testimony is completely accurate, assuming everything was said was accurate *1187 and that's the purpose of the trial to determine what the facts are.
The Court: I rule that we are going to move on to something else.
The State argued that the fact that a takedown signal was given proved that a transaction had taken place. Without knowing the precise word or words used as the takedown signal, the defense's ability to challenge the State's witnesses' testimony that the takedown signal had been given was compromised, and the jury had no way to determine whether the audiotape corroborated or disproved their testimony.
Because "[t]he testimony which the appellant tried to elicit related directly to the transaction, event, and subject which the witness had testified to on direct examination by the prosecutor[,] ... in addition to [his] right to offer the evidence under the evidence code, the appellant also had a constitutional right to conduct the examination and receive answers to [his] questions." Johnson v. State, 595 So.2d 132, 135 (Fla. 1st DCA 1992), disapproved on other grounds, Heuss v. State, 687 So.2d 823 (Fla.1996). See U.S. Const. amend. v. & VI; see also Art. I, § 16, Fla. Const. By permitting the State to present testimony that the takedown signal was given, but not allowing the defense a fair opportunity to challenge the assertion, "`[t]he trial court's ruling required defense counsel to trust  not test  [the] Officer['s] testimony.'" Judd v. State, 781 So.2d 440, 443-44 (Fla. 4th DCA 2001) (citations omitted) (holding Sixth Amendment confrontation rights severely restrict police officers' ability to conceal operational methodologies such as surveillance locations). The question "What's the takedown signal in this case?" was plainly related to Detective Cullen's testimony on direct examination and went to issues central to the case.
Whether keeping the "takedown signal" secret serves any purpose that varying it would not serve, appellant's basic due process and confrontation rights outweigh any "need" for official secrecy here. See Johnson, 595 So.2d at 135 ("The only reasons given for barring the testimony were (1) preserving the secrecy of the observation point for purposes of other investigations, and (2) protecting [Officer] Ratcliff's safety, should he use the same observation point in the future. These reasons are not recognized by any privilege, constitutional right, statute or rule. Accordingly, the evidence was not exempt from disclosure."); see also A.E. v. State, 599 So.2d 713, 714-15 (Fla. 1st DCA 1992) (holding officer had to reveal the location from which he had made observations, where it was relevant to the theory of defense, despite assertions that revelation would hamper ongoing drug investigations and possibly even endanger the life of the officer); accord Judd v. State, 781 So.2d 440, 443-45 (Fla. 4th DCA 2001) (holding trial court erred in refusing to require an investigating detective to reveal the location from which he conducted surveillance, where no actual danger was posed to civilians, and in the absence of any officer safety exemption from disclosure).
The trial court's error cannot be deemed harmless. See A.E., 599 So.2d at 715 ("Whether or not A.E. was prejudiced by the appealed rulings cannot be determined from the record before us because the circuit court refused to allow disclosure of the concealed position. Thus, we cannot treat the erroneous rulings as harmless error because the state cannot carry its burden on this issue."); see also Goodwin v. State, 751 So.2d 537, 543-44 (Fla.1999); State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).
Reversed and remanded.
LEWIS, J., concurs; ERVIN, J., dissents with opinion.
*1188 ERVIN, J., dissenting.
I agree with the majority that the admission of the takedown signal would be relevant evidence, i.e.,"evidence tending to prove or disprove a material fact." Section 90.401, Fla. Stat. (2000). I agree also with the majority that the exclusion of such evidence was erroneous; I disagree, however, with its conclusion that the error was harmful. Initially, I consider that the admission of such evidence would have been only marginally relevant. The conversation that transpired between the appellant and the undercover officer was played before the jury, and the jury was made aware of any possible omission of any word or words on the audiotape, which could reasonably be considered a signal to other surveilling officers. Despite the lower court's restriction of cross-examination, defense counsel was fully able to argue to the jury the absence of the purported signal on the tape, and that nothing on the tape revealed the transfer of crack cocaine, which corroborated the defendant's testimony. Notwithstanding this defense, the jury resolved the credibility issue in favor of the state.
After this court's decisions in A.E. v. State, 599 So.2d 713 (Fla. 1st DCA 1992), and Johnson v. State, 595 So.2d 132 (Fla. 1st DCA 1992), reversing the trial court's limitation of cross-examination of state witnesses, the Florida Supreme Court approved the following statements made by the United States Supreme Court in Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), observing that "`trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Moore v. State, 701 So.2d 545, 549 (Fla.1997).
In applying the harmless error test of State v. DiGuilio, 491 So.2d 1129 (Fla.1986), to the case at bar, it is very difficult for me to believe that the state did not meet its burden of proving beyond a reasonable doubt that the error complained of did not contribute to the verdict reached by the jury. If Detective Cullen were required on retrial of the case to reveal the identity of the signal, I would be unable to reasonably conclude that such fact alone would cause the result to be different, i.e., that the jury would then believe the defendant's version of the events and acquit him. All that would change would be the testimony of the officer articulating the signal that may or may not have been on the tape. The attenuated possibility of a different outcome is, in my judgment, unreasonably remote. I would affirm.