908 So.2d 543 (2005)
Reginald BORDELON, Appellant,
v.
STATE of Florida, Appellee.
No. 1D04-1294.
District Court of Appeal of Florida, First District.
July 29, 2005.
Nancy A. Daniels, Public Defender; Edgar Lee Elzie, Jr., Assistant Public Defender, Tallahassee, for Appellant.
Charlie Crist, Attorney General; Felicia A. Wilcox, Assistant Attorney General, Tallahassee, for Appellee.
BENTON, J.
We reverse Reginald Bordelon's conviction for giving a false name to a law *544 enforcement officer after he had been "arrested or lawfully detained by a law enforcement officer," in violation of section 901.36(1), Florida Statutes (2003), and remand for a new trial in which his rights to cross-examine his accusers are not arbitrarily curtailed.
Escambia County Sheriff's Deputy Mike Hallmark testified that while he was in a Food World parking lot on the evening of October 12, 2003, he heard "a commotion, heard some voices across the parking lot." Looking in the direction of the voices, he testified, he saw a car in a turn lane and two young women crossing the street in front of the car. He testified that he "believed that there could be a chance that there could be a disturbance, so [he] proceeded directly up to that area"; that when he drove over to the car, its driver, Mr. Bordelon, got out of his vehicle and stood next to it; and that, when Deputy Hallmark asked the young women if there was a problem, they answered that the man in the car had yelled at them. Deputy Hallmark "decided at that time that no further action needed to be taken on their part, and they went on [] their way," then asked Mr. Bordelon for identification, "since I had observed him driving a vehicle, and . . . there was a possibility that an altercation had taken place."
The defense contended at trial that Mr. Bordelon had not been "arrested or lawfully detained" at the time he answered Deputy Hallmark or, at least, that there was reasonable doubt about whether he had been detained.[1] The offense of which he stands convicted requires proof of "the giving of a false name to a law enforcement officer . . . during an arrest or lawful detention." Belsky v. State, 831 So.2d 803, 805 (Fla. 4th DCA 2002) (emphasis supplied). See § 901.36(1), Fla. Stat. (2003) ("It is unlawful for a person who has been arrested or lawfully detained by a law enforcement officer to give a false name . . . to the law enforcement officer. . . ."). The statute does not make it a crime to give a false name during a "consensual field interview" when there has been neither arrest nor lawful detention. See Belsky, 831 So.2d at 803-04 (reversing conviction under section 901.36 where "appellant had not been arrested or lawfully detained prior to giving the officer a false name").
On direct examination, Deputy Hallmark, the State's only eyewitness, testified that, when he asked Mr. Bordelon to identify himself, he twice gave the name "Borden" instead of "Bordelon." On cross-examination as to whether Mr. Bordelon had been under arrest when he misidentified himself, Deputy Hallmark answered in the negative, testifying that Mr. Bordelon was under no obligation to remain, but was free to leave on both occasions that he used the name "Borden." Deputy Hallmark characterized the entire encounter as a "consensual field interview."
On redirect, however, Deputy Hallmark answered "Yes, sir" to this leading question by the State: "Was Mr. Bordelon detained at least to the extent that he was to wait until you determined his identification?" Nobody had used the word "detained" *545 on direct examination or on cross-examination.[2]See Smith v. State, 904 So.2d 534, 536 n. 1 (Fla. 1st DCA 2005) ("The word `detained' is a term of art, having a particular legal meaning in the law enforcement context. To `detain' someone is to hold the person in custody; confine them; or subject them to a compulsory delay. See Black's Law Dictionary 480 (8th ed.2004).").
When defense counsel sought to inquire whether, in adopting his interrogator's word "detained," Deputy Hallmark had intended to repudiate his earlier testimony, the following transpired:
MR. OBIN [Defense Counsel]:
Q. Just previously with the Government questioning you, you used the word "detained," correct?
A. For the girls?
Q. No, sir, not concerning the last question by the Government, but previously the issue came up as to whether Mr. Bordelon was detained.
THE COURT: Sir, we went into this last time around. Unless you've got something new to ask, then this is not  you can't just keep plowing the same ground. You've got to ask something new or don't ask anything.
MR. OBIN: May I approach, Your Honor?
THE COURT: You've already asked him about being detained and I'm going to instruct the jury, because if he is lawfully detained  this is not an obstruction of justice case.
MR. OBIN: I realize, Judge.
THE COURT: It's not an obstruction of justice case. This is, is he lawfully detained as opposed to whether or not he's free to go. That's not the question. Lawfully detained is the question.
So unless you've got something that you want to ask him that's new
MR. OBIN: May I approach, Your Honor?
THE COURT: No, sir. You can ask him anything you want to that's new.
Q. (By Mr. Obin) Well, Officer, when the Government was doing their opportunity for rebuttal, they brought into question, after your testimony to me, the word "detained," that was something that was new. Thus  am I incorrect?
A. No, sir, I believe the word was used.
Q. I believe it was, too. And then that being the case, since that was something that was new, could you please tell me, Officer, when Mr. Bordelon was detained?
THE COURT: We went into this on the original cross about detaining and free to go. Sir, that is not new. Please move on to a new area.
In short, possibly on account of a misapprehension concerning one of the elements of the offense, the learned trial judge cut off recross-examination about "something that was new" before counsel could really begin.
Cross-examination is at once an important incentive for, and the adversary *546 system's great engine for testing for, truthful testimony. Eschewing the rack and screw, we count on cross-examination after direct examination or, where redirect examination yields new matter, recross-examination after redirect examination, to ferret out the truth from any and all witnesses, and to gain a fuller understanding of the import of their testimony. See Sanders v. State, 707 So.2d 664, 667 (Fla.1998) ("[L]imiting cross-examination in a manner that precludes relevant and important facts bearing on the trustworthiness of testimony constitutes error, especially when the cross-examination is directed at a witness for the prosecution."). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).
When new material is developed on redirect examination, recross-examination must be allowed. See Kelly v. State, 842 So.2d 223, 226 (Fla. 1st DCA 2003) (holding that, while "[t]he decision to allow recross examination is generally subject to the discretion of the trial court . . ., when new matters are introduced during redirect examination, denying recross effectively denies the opposing party the right [of] any cross examination on the new matter and, thus, violates the confrontation clause"); see also Barr v. State, 881 So.2d 1185, 1187 (Fla. 1st DCA 2004) ("Because `[t]he testimony which the appellant tried to elicit related directly to the transaction, event, and subject which the witness had testified to on direct examination by the prosecutor[,] . . . in addition to [his] right to offer the evidence under the evidence code, the appellant also had a constitutional right [under the Sixth Amendment's Confrontation Clause] to conduct the examination and receive answers to [his] questions.'") (quotation omitted).
The trial court erred in precluding recross-examination designed to test the reliability of testimony, newly elicited from the defendant's chief accuser on redirect, that went to a central issue in a criminal trial. See Baucham v. State, 881 So.2d 95, 97 (Fla. 1st DCA 2004) (holding limitation on cross-examination of witness testifying on an issue central to defense was reversible error); Kelly, 842 So.2d at 226 ("To deny the defendant the opportunity to put these matters before the jury constituted an abuse of discretion. See Simmons v. State, 552 So.2d 268 (Fla. 1st DCA 1989) (holding that failure to allow impeachment on recross constituted reversible error)."). The new material developed on redirect examination here went to an issue lying at the heart of the case. Deputy Hallmark's testimony on redirect was presumably the very evidence on account of which the trial court denied appellant's motions for judgment of acquittal.[3]
Reversed and remanded.
BARFIELD and HAWKES, JJ., concur.
NOTES
[1] We do not reach the separate question of whether any detention was lawful. The only reason Deputy Hallmark gave for asking Mr. Bordelon for his identification was that he "had observed him driving a vehicle, and [] there was a possibility that an [entirely verbal] altercation had taken place." "To detain a person for investigation, an officer must have a reasonable suspicion, based on objective, articulable facts, that the person has committed, is committing, or is about to commit a crime. . . . A bare suspicion or `mere `hunch' that criminal activity may be occurring is not sufficient.'" Belsky v. State, 831 So.2d 803, 804 (Fla. 4th DCA 2002) (citations omitted).
[2] Except for this use of the word "detained"by the prosecutoron redirect examination of Deputy Hallmark, all the evidence adduced at trial was consistent with Deputy Hallmark's testimony that the entire encounter with Mr. Bordelon was a "consensual field interview." See Belsky v. State, 831 So.2d 803, 805 (Fla. 4th DCA 2002) ("[T]he officer's initial contact with appellant was a consensual encounter, during which the officer could properly ask for appellant's name. We do not agree . . . that the events which followed, i.e., the officer's computer search and additional questioning of appellant following failure to confirm his name, necessarily converted the consensual encounter into a stop and detention.") (citations omitted).
[3] The motions for judgment of acquittal stated as grounds the lack of evidence that Mr. Bordelon had been detained at the time he gave a false name, arguing that all of the State's evidence showed that he was free to leave during the "consensual field interview" with Deputy Hallmark. The trial court denied both motions, necessarily ruling that evidence had been adduced both that there was a detention and that the detention was lawful.