2024 IL App (1st) 22-0384-U
Order filed: January 11, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-0384

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 712 |
| | ) | |
| ANDRE EVANS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justice Martin concurred in the judgment.
Justice Ocasio III dissented.

**ORDER**

¶ 1     *Held*:   We found that the trial court did not err in denying defendant's motion to suppress evidence which was recovered during a search of his vehicle after a traffic stop and affirm his convictions and sentences for unlawful possession of a weapon by a felon and controlled substances.

¶ 2     Defendant-appellant, Andre Evans, was convicted of unlawful possession of a weapon by a felon and possession of a controlled substance (cocaine) and a controlled substance (fentanyl) and sentenced to 8 years' imprisonment. On appeal, Evans argues that the trial court erred in denying his motion to suppress the evidence which was seized after a search of his vehicle following a traffic stop where the search lacked probable cause. We affirm.

¶ 3     Evans was charged with three counts of possession of a controlled substance with intent to

deliver involving heroin, heroin with fentanyl, and cocaine and one count each of possession of cannabis with intent to deliver and unlawful use or possession of a weapon by a felon, based on conduct alleged to have occurred on September 23, 2019. Prior to trial, Evans filed a motion to suppress the evidence which had been recovered after he was stopped for a traffic violation.

¶ 4    At the hearing on the motion, Evans called Maria Sigartau, an officer with the Chicago Police Department (CPD), as a witness. During the direct examination, Sigartau was questioned about a recorded video from her body worn camera (video), but the video was not admitted into evidence or published to the court by Evans. Instead, the State received the court's permission to publish the video during its cross-examination of Sigartau.

¶ 5    According to her direct testimony, Sigartu had been with the CPD for seven years and a tactical officer for the prior two to three years. On September 23, 2019, she was working as a tactical officer with her partner Officer Reginald Engram; they were in plain clothes and riding in an unmarked vehicle. At about 4:17 p.m., they were traveling eastbound in an alley between Waller and Parkside Avenues directly behind a silver Hyundai driven by Evans with no other occupants. Evans turned the Hyundai north from the alley and onto Parkside Avenue without using a turn signal and was stopped by the officers.

¶ 6    With her body-worn camera activated, Sigartau walked to the Hyundai on the driver's side. Through the open driver's window, Evans gave Sigartau his driver's license and insurance card. He "probably" told her that the Hyundai belonged to his girlfriend.

¶ 7    While at the driver's door, Sigartau observed, on top of the center console, a clear knotted plastic bag containing smaller orange plastic bags with white powder. Sigartau was standing four feet from the contraband and nothing obscured her vision. She believed the bag contained narcotics

which she had seen "many times before." Evans would move his elbow toward the console but she could still see the contraband. Sigartau did not tell Engram about observing the suspected narcotics or smelling the cannabis.

¶ 8 When she asked Evans if there was anything in the Hyundai which he should not have, he said no. She also inquired, as she does regularly during traffic stops, whether he had a valid Firearm Owner's Identification (FOID) card or concealed carry license, and his answer was no. She had not seen a gun but suspected that one might be in the car. Sigartau asked Evans again if he had anything in the Hyundai that she should know about and told him that her concern was not small amounts of weed but guns. Evans declined her request to search the Hyundai. Sigartau could still see the suspect narcotics.

¶ 9 Sigartau instructed Evans to get out of the Hyundai and he asked the reason. She replied that it was a lawful order and if he did not comply he would be arrested. Evans exited the Hyundai and was immediately handcuffed. The bag of suspect narcotics was still visible on the console. Sigartau told Evans that he was not under arrest, he was only being detained and she wanted to talk to him. When asked again, Evans continued to deny that there was anything in the Hyundai that Sigartau should know about. Sigartau told Evans that at the time of the stop, she saw him reaching forward in the car. Evans denied that he had done so and said the windows were tinted which made it difficult to see into the Hyundai.

¶ 10 After being asked again, Evans refused permission to search the Hyundai. Engram stayed with Evans while Sigartau went to the police vehicle and ran Evans's driver's license; she found it valid.

¶ 11 After returning to Evans, she asked him one more time to tell her what was in the Hyundai

and he replied that there was nothing. Sigartau went to the Hyundai and opened the driver side door to search the Hyundai. She first searched the pocket of that door as part of a "systematic search" and because "the bag [on the console] wasn't going anywhere." Sigartau did not question defendant about the contraband before searching the Hyundai for safety reasons. After retrieving the contraband, Sigartau called for a transport car which was her first notification to any other police officer that she was involved in more than a traffic stop.

¶ 12    On cross-examination by the State, Sigartau testified that when she first approached the driver's side of the Hyundai, she observed Evans "doing motions to the right side of his body around the center console and also to the lower side of his body towards his seat." When she first arrived at the Hyundai, the driver's window was open, and she noticed a fresh odor of cannabis and observed "a clear knotted plastic bag containing smaller plastic bags orange color." As a tactical officer, she previously had made hundreds of narcotics arrests and had seen items packaged in a similar way "numerous times." And on multiple occasions, Sigartau had recovered the same sort of items which later tested positive for narcotics. Sigartau was familiar with the locale where the stop occurred and considered it a high crime and narcotics area. She had been involved with arrests and investigations relating both to narcotics (close to 100) and firearms (probably more than 10) in that area.

¶ 13    When she first smelled the odor of cannabis and saw the suspect narcotics, she did not say anything to Evans for fear he might drive away or start a fight. He was still in the Hyundai with the keys. For safety reasons, Sigartau handcuffed Evans, who was much taller than her. She did not retrieve the suspect narcotics immediately after Evans was placed in handcuffs because the drugs "weren't going anywhere," the Hyundai's driver door was closed, and there was no one else

around.

¶ 14    Sigartau performed a systematic search of the Hyundai as she was trained to do so that nothing was missed. During the search, she retrieved the bag with suspect narcotics from the top of the console. From inside the console, she recovered more suspect narcotics, a firearm, and United States currency. At that point, Evans was "formally" placed into custody and the items were inventoried. During custodial searches of Evans both at the scene and at the police station, more items of suspect narcotics were recovered.

¶ 15    Sigartau testified that the video truly and accurately depicted her interactions with Evans on September 23, 2019. The court allowed the video to be published, but it was not formally admitted into evidence.

¶ 16    Around the 2 minutes and 31 seconds mark, the State asked Sigartau to step down from the witness stand and point to "where she sees that item." After she did that, the video continued to play until it only "showed a steering wheel" according to defense counsel. The State moved the video forward "to some evidentiary value." The video continued without comment or narration by Sigartau until it was stopped at the 9 minutes and 22 second mark.

¶ 17    In response to the State's question as to where the camera was positioned on her vest, Sigartau pointed to the middle of her chest. She agreed that the camera's viewpoint would have been different from her own line of sight into the Hyundai because of its position on her chest.

¶ 18    We have reviewed the video with the audio and find it was consistent with Sigartau's testimony at the hearing as to her interactions and conversations with Evans, including her requests to search the Hyundai, questions as to whether there was anything of concern in the Hyundai, remark that she was not interested in weed but guns, and inquiry as to whether he had a FOID card

or concealed carry permit. When Sigartau first approached the Hyundai, Evans was in the driver's seat with the window open. While Sigartau is speaking with Evans at his window, (from approximately the 2 minutes and 10 seconds to 2 minutes and 32 seconds mark), at times, an orange object can be seen next to what looks like a small pink tube on top of the center console near the closed storage compartment. The orange object can be seen at the 2 minute and 31 second mark, which is at the point in the video when Sigartau identified "that item" during the State's examination.

¶ 19    Before Evans exited the Hyundai, he closed the driver's side window. After exiting he locked the Hyundai and put a set of keys in the front pocket of his sweatshirt. He was handcuffed while standing behind the Hyundai. Sigartau went to her vehicle and came back to Evans a few minutes later. She, again, asked him what was in the Hyundai and he responded that he did not have anything in the car. Sigartau took the keys from Evans's pocket and he asked why she was going to enter his car.

¶ 20    After opening the driver's side door and while standing in the open door, Sigartau searched the door pocket. The video then shows the inside of the car and Sigartau steps back from the vehicle. The video turns toward Evans, and Sigartau states "In plain view, it's in plain view. It's not even—I told you to tell me." Evans responded: "So what? So you could put me right in the car?" Sigartau responded: "Really? Really? No, I could do something about it." Sigartau then re-enters the vehicle and the video shows the orange bag of contraband next to the small pink tube in front of the closed storage compartment (at approximately the 8 minutes and 50 seconds mark). Two cell phones are next to the gear shift lever. Sigartau opens the storage compartment of the console and finds the gun, cash, and other bags of drugs. At this point, Sigartau used her radio to

request a transport. The dispatch person told Sigartau that she "came in real low" and asked her to repeat herself, which Sigartau did. Sigartau recovered the contraband from the closed storage compartment in the console.

¶ 21    Evans did not redirect Sigartau or call other witnesses. In argument, Evans maintained that Sigartau searched the Hyundai without probable cause because Sigartau did not see drugs in plain view nor smell the odor of cannabis. Evans did not argue the stop was illegal or pretextual.

¶ 22    The trial court denied the motion to suppress evidence and said:

"I've listened to the officer and observed her demeanor while testifying. Did she have a right to stop the car? It's not contested that there was no turn signal when Mr. Evans turned his car out of the alley. At that time the officer did have a right to stop the car based on the traffic violation.

Once the car was stopped, Officer Sigartau said she seen [*sic*] on the console suspect heroin and she also testified that she smelled marijuana. A reasonable explanation is that she didn't announce it was she explained that Mr. Evans is bigger than her and this is for her own safety. Then when Mr. Evans was taken to the rear of the car, certainly he was under arrest at that time. Then further counsel asked why if they know there is probable cause, why would they ask the accused if he would consent to a search? The easiest answer in the whole world is he has a right to waive his constitutional rights. That's the answer to that.

I find looking and taking all the testimony in consideration, all the circumstances here, the motion to suppress statement is denied in that there was probable cause that the heroin was in plain view and that she, according to her testimony, she smelled marijuana

which was a violation at that time. There was probable cause. Motion to suppress the evidence is denied."

¶ 23    The case proceeded to a jury trial on January 31, 2022.

¶ 24    The State called Sigartau as a witness and, consistent with her testimony at the suppression hearing, she first testified as to the circumstances surrounding the traffic stop of Evans on September 23, 2019 and that she smelled the odor of cannabis and saw the suspect narcotics when she was at the driver's door of the Hyundai. She was trained at the police academy about investigating and identifying illegal drugs.

¶ 25    Based on her observation of the contraband and the odor of cannabis. Sigartau asked Evans to step out of the car. She conducted a systematic search of the Hyundai starting at the door and finishing inside the vehicle "so I won't miss anything."

¶ 26    At the request of the State, and without objection, the court admitted the video (People Ex. 1) into evidence and allowed publication to the jury. The State played the video without the audio and at times, paused the video to ask Sigartau questions about what was depicted. At one pause in the video, Sigartau explained that she handcuffed Evans because she had seen the contraband and smelled the cannabis and for safety reasons; she is five-two and Evans is six-four. Sigartau will handcuff suspects before notifying them of her observations and telling them they are being arrested to avoid physical confrontations. In the past, suspects have attempted to avoid arrest and have pushed, bitten, kicked, and punched her.

¶ 27    At a point where the video showed Evans standing at the rear of the Hyundai, Sigartau testified that, at the time, she was running Evans's license in the police vehicle. When returning to Evans, she asked him if there was anything illegal in his vehicle in an attempt to confirm her

observations. When the video showed her search of the Hyundai, the officer pointed to the bag, which she had seen before Evans exited the vehicle.

¶ 28    Sigartau also identified on the video what she found in the storage compartment center console: a firearm, $2,800 in cash, and bags which were larger than the one on top of the console but packaged similarly. These bags contained multiple smaller bags which were the same orange color, and with a white powdery substance inside, suspected to be heroin. She also discovered a larger bag containing a green leafy substance, suspected to be cannabis.

¶ 29    During the other pauses in the video, Sigartau explained that she had asked Engram for gloves in order to recover the various items of contraband. She inventoried the recovered items and placed them in evidence bags.

¶ 30    An assisting unit arrived and Officer Raul Cervantes searched Evans before he was placed in the transport vehicle. After this search, Engram handed Sigartau a clear plastic bag which held smaller orange Ziplock plastic bags containing substances suspected to be heroin; the packaging was similar to that found in the Hyundai.

¶ 31    Sigartau identified the recovered items: the firearm, magazine, and live ammunition from the magazine and chamber of the gun and the suspected narcotics. The court admitted the items into evidence.

¶ 32    On cross-examination, Sigartau testified that they were fifteen feet behind the Hyundai when Evans turned left from the alley. As soon as she arrived at the driver's door she smelled cannabis and observed the bag of suspect narcotics. She had no doubt that the bag contained narcotics based on her experience in seeing drugs in similar packaging. She did not say on the video and did not tell Evans, Engram, the dispatch officer, or Cervantes that she had smelled

cannabis. She did say to Evans that she did not care about the "weed." She also did not tell Evans or Engram about the suspect narcotics in plain view before her search. She did not call dispatch for backup when she was in the police vehicle running Evans's license. Sigartau agreed that the odor of cannabis and drugs in plain view during a traffic stop would provide probable cause and allow her to search a vehicle without obtaining a search warrant or permission.

¶ 33    She testified as she did at the suppression hearing about her conversations with Evans at the scene including asking Evans for permission to search the Hyundai and tell her what may be in the vehicle. Evans did not attempt to flee the scene.

¶ 34    Cervantes testified that, on September 23, 2019, he searched Evans at the scene before transporting him to the station. He recovered multiple orange Ziploc bags containing a white powder-like substance suspect heroin from Evans's sock. At the station, during a custodial search a clear Ziploc bag with multiple clear Ziploc bags containing suspect crack cocaine was recovered from Evans's person. The items recovered during the custodial searches were inventoried, and Cervantes identified them in court.

¶ 35    Cervantes was not wearing a body-worn camera that day but part of the recovery of the narcotics from the search of Evans at the scene is visible from the body-worn camera of Engram. The video from Engram's camera (Engram video) was admitted into evidence and a short portion was played for the jury. At the 21:22:21 mark, the Engram video was paused as Cervantes identified himself, his partner, and Evans. Cervantes testified that the Engram video shows him handing Engram what he found in Evans's sock.

¶ 36    On cross-examination Cervantes did not recall why he was not wearing a body-worn camera on that day nor whether it was "possible" he was wearing his camera but did not turn it on.

The published part of the Engram video does not show Cervante's search of Evans. Cervantes was shown the inventory slips relating to the items recovered during the custodial searches of Evans which indicated that the items were found by Sigartua.

¶ 37    According to stipulations, Evans was convicted of a qualifying felony offense as to the unlawful possession of a gun by a felon charge.

¶ 38    Further, the police recovered suspect heroin in orange tinted Ziploc bags and inventoried in groups of 21, 14, and 112 bags. The police also recovered and inventoried 26 Ziploc bags with a money sign logo containing suspect crack cocaine.

¶ 39    Melissa McCann a forensic chemist with the Illinois State Police Crime Lab conducted proper testing of substances contained in the recovered Ziploc bags. Her expert opinion was that 1.5 grams of the powdered substances from one of the 21 Ziploc bags (weighing a total of 11.6 grams) tested positive for heroin. Of the 14 Ziploc bags (weighing a total of 6.8 grams), 0.5 grams tested positive for heroin. Of 80 items recovered (weighing a total of 39 grams), 15.6 grams of powder tested positive for heroin and fentanyl. Finally, 1.1 grams of a chunky substance from 11 Ziploc bags (weighing a total of 1.5 grams) tested positive for cocaine.

¶ 40    Evans rested after his motion for directed verdict was denied.

¶ 41    The jury considered only the charges of possession of a controlled substance with intent to deliver (Fentanyl), possession with intent to deliver (cocaine), and unlawful possession of a weapon by a felon. The jury found Evans guilty of the lesser included offenses of possession of fentanyl and cocaine and unlawful possession of a weapon by a felon.

¶ 42    In his motion for a new trial, Evans argued that the court erred in denying his motion to suppress. He contended that Sigartau "may have seen suspect narcotics in plain view on the shelf

in front of the console but not before restraining Evans, opening the car door and entering the car during a systematic search of the car." The posttrial motion did not attack the traffic stop as invalid or pretextual. The court denied the posttrial motion.

¶ 43 Evans was sentenced to concurrent terms of eight years for unlawful possession of a weapon by a felon and three years for each of the possession of a controlled substance charges. The trial court denied Evans's motion to reduce the sentences. Evans has appealed.

¶ 44 On appeal, Evans argues that the trial court erred in denying his motion to suppress because Sigartau lacked probable cause to search the Hyundai. He maintains that Sigartau's behavior at the scene as captured on the video rebuts her testimony that she saw drugs in plain view and smelled the odor of cannabis before her search.

¶ 45 Under the Fourth Amendment of the United States Constitution individuals are protected from unreasonable searches and seizures. U.S. Const., amend. IV. In reviewing the circuit court's ruling on a motion to suppress, we uphold the findings of fact unless they are against the manifest weight of the evidence and review *de novo* the ultimate legal question of whether suppression of the evidence was warranted. *People v. Eubanks*, 2019 IL 123525, ¶ 33; *People v. Cregan*, 2014 IL 113600, ¶ 22. We may consider the evidence presented at both the suppression hearing and the trial in our review of the motion to suppress. *People v. Murdock*, 2012 IL 112362, ¶¶ 35-36.

¶ 46 A defendant has the initial burden of making a *prima facie* showing that the evidence at issue was obtained by an illegal search or seizure and if defendant meets this burden then the burden shifts to the State to present evidence to counter the *prima facie* showing. *Cregan*, 2014 IL 113600, ¶ 23; *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 23. The ultimate burden of proof remains with the defendant. *Thornton*, 2020 IL App (1st) 170753, ¶ 23.

¶ 47    A search and seizure is reasonable under the fourth amendment if there is a warrant issued after a finding of probable cause. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). " 'Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime.' " *People v. Molnar*, 2021 IL App (2d) 190289, ¶ 12 (quoting *People v. Garvin*, 219 Ill. 2d 104, 126 (2006)).

¶ 48    There are exceptions to the warrant requirement for a search. One exception is that police may conduct a warrantless search of an automobile if there is probable cause to believe that the automobile contains evidence of criminal activity that the officers are entitled to seize. *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). Additionally, "the plain-view doctrine authorizes the warrantless seizure of an illegal item visible to a police officer whose access to the item has some prior justification under the fourth amendment and who has probable cause to suspect the item is connected to criminal activity." *Molnar*, 2021 IL App (2d) 190289, ¶ 12 (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)). Under this doctrine, a police officer "may seize property that is in plain view if three requirements are met:(1) the officer is lawfully located in the place where he observed the object; (2) the object is in plain view; and (3) the object's incriminating nature is immediately apparent." *Molnar*, 2021 IL App (2d) 190289, ¶ 12 (quoting *People v. Garcia*, 2012 IL App (1st) 102940, ¶ 4).

¶ 49    The third requirement of the plain view doctrine is met, if the officer has probable cause that the object in plain view is evidence of a crime without searching further. *People v. Sinegal*, 409 Ill. App. 3d 1130, 1135-36 (2011) (citing *People v. Jones*, 215 Ill. 2d 261, 272 (2005). The officer's belief in the object's criminality need not be correct or more probably true than false.

*People v. Petty*, 2017 IL App (1ˢᵗ) 150641, ¶ 32. "[I]n deciding whether probable cause exists, a law enforcement officer may rely on training and experience to draw inferences and make deductions that well elude an untrained person." *Jones*, 215 Ill. 2d at 274.

¶ 50    Sigartau and Emerson conducted a stop of Evans after he made a left turn out of the alley without using his signal in violation of 625 ILCS 5/11-804 (West 2018). Sigartau approached the stopped Hyundai as she was allowed to do. See *People v. Jones*, 215 Ill. 2d 261, 270 (2005) (finding that the officer's traffic stop was justified where he observed the defendant driving without operating taillights); *People v. Rucker*, 294 Ill. App. 3d 218, 224 (2nd Dist. 1998) (A traffic stop provides a reasonable, articulable suspicion of criminal activity to lawfully permit an officer to approach a vehicle for purposes of the "plain view" doctrine.). At the time of the stop, Sigartau was an experienced police officer, had been trained on the identification of illegal drugs and had extensive involvement in narcotics investigation and arrests. While at the open driver's window, the officer smelled the odor of fresh cannabis and in plain view saw a clear plastic bag containing small orange plastic bags with white powder on top of the center console. Sigartau had seen drugs packaged in this way before and was certain that the bag contained illegal drugs. She stood four feet from the contraband and could see the bag even when Evans moved his elbow in the direction of the console.

¶ 51    On the video (starting around the 2 minute and 10 seconds point), while Evans is still seated in the Hyundai, an orange object next to what looks like a small pink tube is visible. In the portion of the video when Sigartau is conducting the search of the Hyundai, an orange bag can be seen next to the small pink tube just as it could be seen on the video when Sigartau was standing outside of the open driver's window while Evans was in the driver's seat. At both times the bag is located

where Sigartau testified it had been in plain view.

¶ 52    The three requirements for the application of the plain view doctrine have been met. Sigartau was authorized to stop and approach the Hyundai. Through the open window she smelled the fresh odor of cannabis and observed the bag of suspect narcotics on the top of the console in plain view. Based on Sigartua's experience and training, the criminal nature of the bag was immediately evident to her. The record demonstrates that the trial court's finding that the contraband was in plain view was not against the manifest weight of the evidence.

¶ 53    In denying the motion to suppress the trial court stated that it had assessed the demeanor of Sigartau while testifying at the hearing and by its ruling implicitly found Sigartau's testimony credible. We accord great deference to the trial court's factual and credibility determinations when reviewing a ruling on a motion to suppress. *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 22. We will only disturb these findings if they are against the manifest weight of the evidence. *Id.*

¶ 54    Evans argues that under *People v. Shaw*, 2015 IL App (1st) 123157 ¶ 29, we should give less deference to the trial court's findings of fact and credibility determination because the evidence included the video. The defendant in *Shaw* was found guilty of robbery in a bench trial with the trial court finding that the victim was credible. *Id.* ¶ 15. On appeal the defendant argued that the evidence was insufficient to sustain his conviction and maintained the victim's testimony was not credible. *Id.* ¶ 17. The evidence in *Shaw* included surveillance videos. *Id.* ¶ 8. In reviewing the trial court's assessment of credibility and the finding of guilty, this court said that it was in the same position as the trial court when evaluating the surveillance videos. *Id.* ¶ 29 (citing *People v Radojcic*, 2013 IL 114197, ¶ 34). In *Radojcic*, the issue before our supreme court was whether the State had made the requisite evidentiary showing for the application of the crime-fraud exception

to the attorney-client privilege. *Radojcic*, 2013 IL 114197, ¶ 32. The only evidence presented to the trial court was transcripts from grand jury proceedings. *Id.* ¶ 34. The supreme court held the "trial court did not occupy a superior position to the appellate court or this court in evaluating the evidence offered by the State in support of the crime-fraud exception." *Id.* The supreme court went on to say that in any event the issue was a legal one which was subject to *de novo* review. *Id.* ¶ 35.

¶ 55    In *Shaw*, this court found that the police witness testimony and the surveillance videos directly contradicted the victim's testimony rendering his testimony incredible. *Shaw*, 2015 IL App (1st) 123157 ¶ 27. In other words, the trial court's finding that the victim was credible was against the manifest weight of the evidence. *Id.* ¶ 30. Even where the evidence includes a video, the *Shaw* court recognized "that great deference is due to the factual findings of the trial court." *Id*. We find that the same principle applies here. Even following *Shaw* as to our evaluation of the video, we must give great deference to the trial court's findings unless the record shows that those findings are against the manifest weight of the evidence.

¶ 56    Here, Sigartau's testimony about her conversations and interactions with Evans was consistent with the video. Her testimony that while standing outside the driver's door, she saw the bag containing other orange bags on the center console of the Hyundai, just four feet away is also supported by the video. As discussed, the video shows an orange object next to a small pink tube, while Evans is seated in the driver's seat. Because her body-worn camera was on her chest, Sigartau's line of vision would have been more expansive. No one entered the Hyundai after Evans closed the window, exited, and locked the Hyundai. When Sigartau conducted the search of the Hyundai, without Evans in the driver's seat, the video shows the bag of narcotics as described by Sigartau on top of the console and next to the pink tube. The trial court's finding of credibility was

not against the manifest weight of the evidence.

¶ 57    Evans argues though that there are several grounds for questioning Sigartau's credibility. For one, he points out that Sigartau did not say anything about the suspect narcotics or the odor of cannabis prior to her search.

¶ 58    However, at the hearing and at the trial, Sigartau explained that she does not alert suspects to her observations for safety reasons and because they may attempt to flee. When she smelled the marijuana and she saw the drugs, Evans was still in the Hyundai with the key. Sigartau explained that if she tells a subject what she has observed, "they don't want to be arrested." In the past, suspects have punched, kicked, pushed, and bitten her. After Evans left the Hyundai and was handcuffed, again, for safety reasons, Sigartau performed the systematic search of the car. She quietly called dispatch for a transport when she had recovered the drugs. The trial court's assessment in favor of Sigartau's explanation as to why she did not tell Evans that she observed the bag of suspect narcotics and smelled cannabis prior to the search was not manifestly erroneous. See *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (citing, *People v. Gonzalez*,184 Ill. 2d 402, 412 (1999)).

¶ 59    Next Evans, citing *People v. Litwin*, 2015 IL App 3d 140429, contends that if Sigartau had smelled cannabis and seen suspect narcotics she would not have asked him about what was in the Hyundai nor sought permission to search the car. At trial, Sigartau explained that she was seeking confirmation of her observations. And Sigartau told Evans as captured on the video that she was concerned about whether guns may be in the Hyundai. It is not unreasonable for an officer to attempt to learn if there is anything dangerous in a vehicle in which drugs are in plain view before entering the vehicle to conduct a search.

¶ 60    In *Litman*, the defendant argued that the trial court erred in failing to suppress evidence recovered after a search of his vehicle following a traffic stop. *Id.* ¶ 32. The defendant filed two motions to suppress which were subject to separate hearings. *Id.* ¶¶ 3, 22. The officer who stopped defendant testified to smelling the odor of cannabis coming from the vehicle while he was talking to the defendant. *Id.* ¶ 4. The officer did not say anything about the odor until after asking the defendant for consent to search. *Id.* About forty-five minutes after the initiation of the stop, the officer issued a warning ticket and asked for permission to search the vehicle which the defendant refused. *Id.* ¶ 9. The search took place about an hour and a half after the stop began. *Id.* The officer discovered cannabis in the trunk. *Id.* ¶¶ 1, 11. In denying the motion to suppress, the trial court found the officer was credible as to the smell of cannabis. *Id.* ¶ 15.

¶ 61    On appeal, the question was whether the police unreasonably prolonged the duration of the stop. *Id.* ¶ 36. The appellate court questioned the credibility of the officer in part because he had asked for the defendant's consent to search the vehicle when he had probable cause to search based on the smell of cannabis. *Id.* ¶ 40. Notably, there also was evidence at the hearing which conflicted with the officer's testimony. *Id.* The K-9 officer who arrived at the scene testified that he did not smell cannabis and his dog made two passes around the defendant's vehicle and did not alert. *Id.* ¶ 42. Additionally, the defendant presented expert testimony that the videotape of the arrest had been manipulated. *Id.* ¶ 41-44. Based on that record, the *Litman* court found that the finding that the officer was credible was against the manifest weight of the evidence. *Id.* ¶ 44.

¶ 62    Sigartau's testimony was that she not only noticed the odor of cannabis but also saw the suspect narcotics in plain view. There was no evidence which rebutted Sigartau's testimony about the odor of cannabis as was presented in *Litman*. The video supports Sigartau's testimony that the

bag of suspect narcotics was on top of the console and could be seen when she stood at the driver's door. Evans does not claim the duration of his traffic stop was unreasonably prolonged. For these reasons, *Litman* does not support a finding that the denial of the motion to suppress was erroneous.

¶ 63    Finally, Evans contends that this case " give[s] rise to at least the potential of a pretextual stop." The question as to whether a stop was valid is distinct from the separate question as to whether a search was proper. *People v. Sorensen*, 196 Ill. 2d 425, 433 (2001). To properly preserve an issue for appeal, a party must raise it in a motion to suppress, object at trial, and file a posttrial motion challenging the issue. *People v. Borys*, 2013 IL App (1st) 11629, ¶ 20 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Evans did not challenge the validity or the nature of the traffic stop during the hearing on the motion to suppress, at trial, or in his post-trial motion and has therefore forfeited any issue as to the stop on appeal.

¶ 64    For the reasons stated, we conclude that the trial court's factual and credibility findings when denying the motion to suppress were not against the manifest weight of the evidence and find that there was probable cause for the search of the Hyundai. The trial court did not err in its denial of the motion to suppress. We affirm defendant's convictions and sentences.

¶ 65    Affirmed.

¶ 66    JUSTICE OCASIO III, dissenting:

¶ 67    I respectfully, but emphatically, dissent since I conclude that the trial court's decision to credit Officer Sigartau's testimony that she smelled cannabis and saw suspected narcotics before searching the Hyundai was against the manifest weight of the evidence. I assert that the body-worn camera footage, when viewed critically, discerns deception anomalies or provides clues that raise great doubts about Officer Sigartau's veracity.

¶ 68                                    I.

¶ 69    The Austin community on the west side of the City of Chicago is where we lay our scene. A team of tactical officers are on patrol, in plain clothes and in an unmarked vehicle. Andre Evans, the defendant, is driving his girlfriend's Hyundai. While exiting an alley, according to the testimony, he fails to signal a turn. The officers stop Mr. Evans. Mr. Evans provides Officer Sigartau with a valid driver's license and proof of insurance but instead of issuing the ticket immediately, the officer plays for time. The stink of pretext becomes eminently clear when Officer Sigartau requests permission to search the vehicle he's driving, an invitation he declines. After ordering him out of the car and putting him in handcuffs, she does it anyway and comes up with the gun and narcotics on which the charges in this case were based. At the inevitable suppression hearing, Officer Sigartau claims that—contrary to her behavior during the encounter—she knew from the start that she had probable cause to search the vehicle because, when she stepped up to the open driver's-side window, she smelled cannabis and saw what appeared to be narcotics sitting on the center console.

¶ 70    I agree with the majority that we must defer to the trial court's credibility determination unless it is against the manifest weight of the evidence. But that deferential standard "is not a *rubber stamp*," nor does it "require *mindless acceptance*" of the trial court's credibility determination. (Emphasis added.) *People v. Anderson*, 303 Ill. App. 3d 1050, 1057 (1999). Though I am not suggesting usurping the trial court's role as the factfinder, "credulity has its limits." *Id.* We have a duty to examine the trial court's credibility determination to ensure that it was not "unreasonable, arbitrary, or not based on the evidence" and that "an opposite conclusion" is neither

"apparent" nor "clearly evident." *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23; *In re Z.L.*, 2021 IL 126931, ¶ 61.

¶ 71    I began my assessment of the evidence before the trial court by observing that the initial stop of the Hyundai driven by Mr. Evans was pretextual. The underlying traffic violation, turning out of an alley without activating a turn signal, was exceedingly minor. Officer Sigartau and her partner were experienced tactical officers assigned to a narcotics unit who were covertly ranging throughout the district in plain clothes and an unmarked car. They were not there to enforce technical violations of the traffic laws. In fact, Officer Sigartau told Mr. Evans during her initial conversation with him that she was not bothered by a minor traffic violation and did not intend to write him a ticket. This admission is entirely consistent with the circumstances, which show that the traffic violation was merely an excuse for the stop. The actual purpose of the stop was to engage in a fishing expedition for unrelated criminal activity in a supposedly high-crime and high-narcotic area—a trope that, as I will explain later, reeks of racial bias.

¶ 72    Under existing law, the pretextual nature of the stop in this case does not invalidate it. See *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). It does, however, unavoidably affect any reasonable assessment of the credibility of the officers who made it. "A pretextual stop, by definition, harbors an underlying ambition to exceed its original scope." *People v. Thompson*, 283 Ill. App. 3d 796, 804 (1996). Often, "the true objective is to find a legal excuse to accomplish a warrantless search." *Id.* That necessarily "exposes to careful scrutiny disputes over ensuring events." *Id.* The pretextual nature of the stop "is a factor to be weighed" by the factfinder, so we

cannot overlook it when deciding whether the trial court's credibility finding was against the weight of the evidence. See *People v. Lomas*, 349 Ill. App. 3d 462, 468 (2004).

¶ 73    Turning to the initial encounter between Officer Sigartau and Mr. Evans, the footage from the officer's body-worn camera shows her approaching the driver's window of the Hyundai and speaking to Mr. Evans, but it does not disclose what she may have seen or smelled. According to her testimony, it was at Mr. Evans's open window that she smelled the odor of fresh cannabis and saw a knotted, clear plastic bag containing smaller orange plastic bags that, based on her experience, were likely to contain narcotics. The parties agree that these observations, if true, would have provided probable cause to search the car. But a review of the evidence shows that Officer Sigartau's claim to have smelled cannabis and seen suspected narcotics is inconsistent with her actions during the encounter.

¶ 74    First, Officer Sigartau's testimony that she smelled the odor of cannabis and saw what she suspected to be narcotics in plain view is inconsistent with the uncontroverted fact that she did not say anything about those supposed observations until *after* she had found cannabis and narcotics during the search. At the hearing, Officer Sigartau explained that she had avoided saying anything before making those discoveries out of concern that, if alerted, Mr. Evans might try to flee or violently resist being arrested. In my view, the trial court should have questioned this explanation for why Officer Sigartau did not speak up about her observations particularly once Mr. Evans was handcuffed. Once secured, the safety rationale evaporated, and yet Officer Sigartau still said nothing about smelling cannabis or seeing suspected narcotics on the center console: not to Mr. Evans, not to her partner, and not to the police radio dispatcher, who could have sent backup—not even during the two-minute period she sat alone in her unmarked vehicle. Notwithstanding, once

Mr. Evans was in handcuffs, safety concerns did not stop Officer Sigartau from searching the Hyundai or announcing what she had found, which was no less likely to provoke a dangerous response than telling Mr. Evans or her partner what she had smelled and seen before the search.

¶ 75 Officer Sigartau's testimony that she had seen suspected narcotics in plain view on the center console was also inconsistent with how she actually conducted the search of the Hyundai. The footage from her body-worn camera shows that she did not start the search by retrieving the suspected narcotics. Instead, she rifled through the storage pocket in the driver's door. She testified that she began this way because she was conducting a "systematic search" to avoid overlooking something. But the footage from her body-worn camera shows that *she did not continue* her purportedly "systematic" search of the Hyundai after she found contraband on and in the center console. She did not dig through the storage pockets in any of the other doors. She did not open the glove box. She did not search the back seating area or the trunk. Her own conduct contradicts her testimony that she was performing a systematic search of the vehicle.

¶ 76 Moreover, the notion that Officer Sigartau had already seen the suspected narcotics before starting the search is inconsistent with what happened after she searched the driver's door pocket. The body-worn camera footage shows her starting to bend down, reaching toward the base of the driver's seat, before standing back up, gesturing toward the center console, and stating, with exasperation evident in her voice, "It's in plain view. It's in *plain* view. Not even—that's what you were trying to—I told you, tell me." This would be an utterly unremarkable reaction to discovering contraband in plain view. But according to Officer Sigartau, it was not a reaction; she had already seen the suspected narcotics several minutes earlier. To accept that claim would require believing that, rather than simply retrieving what she had already seen in a search that was

23

legally justified, Officer Sigartau decided to engage in an elaborate pantomime serving no apparent purpose other than giving Mr. Evans the impression that she had casually disregarded his constitutional rights.

¶ 77    In short, the evidence at the hearing showed that Officer Sigartau initiated an obviously pretextual stop in the hope of uncovering evidence of some kind of wrongdoing. It also showed that, throughout the stop and search of the Hyundai, Officer Sigartau repeatedly behaved in a way that was not consistent with her claim that she smelled cannabis and saw suspected narcotics in plain view at the start of the encounter. I vehemently believe all the above points to the incredulity of the officer's version of what happened and that the trial court erred by denying Mr. Evans's motion to suppress that evidence. I recognize that the trial court saw and heard Officer Sigartau testify and credited her testimony about what she smelled and saw from the open driver's-side window of the Hyundai. Nevertheless, in view of the apparently pretextual nature of the stop and the significant inconsistencies between the officer's actions, as depicted on the body-worn camera footage, and her words, I believe this is the rare case where the opposite conclusion—that her testimony was not worthy of belief—is "clearly evident." *Z.L.*, 2021 IL 126931, ¶ 61. I would therefore hold that the trial court erred when it denied the motion to suppress, and I would reverse Mr. Evans's convictions. For that reason, I respectfully dissent.

¶ 78                                                      II.

¶ 79    I believe that reversal is called for under established law, but I also think that this case illustrates vividly that existing law is ill-equipped to remedy—and may even perpetuate—unjust racial inequities.

¶ 80     The obviously pretextual basis for the stop in this case is alarming but not surprising. The phenomenon of driving while Black or Brown has been widely recognized. See Jamila Jefferson-Jones, *"Driving While Black" as "Living While Black"*, 106 Iowa L. Rev. 2281 (2021); Anthony E. Mucchetti, *Driving While Brown: A Proposal For Ending Racial Profiling in Emerging Latino Communities*, 8 Harv. Latino L. Rev. 1 (2005). Despite an increased awareness in American society of the systemic racial biases found across our institutions, the data shows that Black and Hispanic drivers continue to be disproportionately stopped by the police. Every year, the Illinois Department of Transportation (IDOT) publishes detailed data about traffic stops that is collected by police departments across the state using a standardized form. See Illinois Department of Transportation, *Illinois Traffic and Pedestrian Stop Study 2022 Annual Report: Traffic Stop Analysis*, Part I at 1 (2023) (IDOT 2022 Traffic Stop Study).[1] Among other things, IDOT estimates the rate at which drivers who fall within six broad racial categories are stopped by a given department. The most recent report estimates that, in 2022, the Chicago Police Department made 79 stops for every 1000 white drivers, 182 stops for every 1000 Hispanic drivers, and 302 stops for every 1000 Black drivers. IDOT 2022 Traffic Stop Study, Part II, at 206. In other words, Hispanic drivers were more than twice as likely to be stopped as white drivers, and Black drivers were almost four times as likely to be stopped as white drivers. In the 15th District, where Mr. Evans was stopped, those disparities were even starker: the stop rates for Hispanic drivers and Black drivers were 2.7 and 11.0 times, respectively, the rate for white drivers. *Id.* at 234. According to a report issued by the Business and Professional People for the Public Interest (BPI), "Black

---

[1] IDOT makes the studies available online. Illinois Department of Transportation, *Studies*, Illinois.gov, https://idot.illinois.gov/transportation-system/local-transportation-partners/law-enforcement/reporting/illinois-traffic-and-pedestrian-stop-study/studies.html (last visited Nov. 20, 2023).

and Latine drivers who were pulled over for a traffic stop [in Chicago] were more likely to be asked for consent to search than white drivers." Loren Jones & Amy Thompson, Business and Professional People for the Public Interest, *A New Vehicle for "Stop and Frisk"* 22 (2023). More disconcerting, the report found that, "[w]hile white drivers made up the largest portion of the driving population, at 36%, they were only subjected to 14% of all stops and 5% of all searches." *Id.*

¶ 81    The stop rates would be concerning on their own, but the problem goes deeper than the inconvenience of being pulled over. According to the BPI report, the data "presents a stark case study of a city that has increasingly relied on traffic stops *as an investigatory tool*." (Emphasis added.) *Id.* at 4. Many of these traffic stops, including the one in this case, have nothing to do with "keeping roads safer." *Id.* at 5. Instead, minor traffic violations are used as excuses to "target innocent Black and Latine drivers." *Id.* These racially discriminatory practices are often papered over by replacing "minority neighborhood" with "high-crime and high-narcotics area," but that trope has worn so thin as to be transparent. The law abhors disparate outcomes. "I cannot accept that Fourth Amendment protections are suspended or reduced in so-called 'high-crime' neighborhoods." *U.S. v. Black*, 525 F. 3d 359 (2008) (Gregory, J., dissenting). Justice Sotomayor of the United States Supreme Court has recognized that "many innocent people are subjected to the humiliations of these unconstitutional [stops and] searches." *Utah v. Strieff*, 579 U.S. 232, 254 (2016) (Sotomayor, J., dissenting).

¶ 82    Why does the law tolerate this obvious injustice? The answer is *Whren*, which deemed a police officer's subjective motivations—such as a desire to go on a fishing expedition based on no suspicion whatsoever—irrelevant to the constitutional propriety of stops and searches.

Intentionally or not, that holding has left ordinary people "without adequate protection against arbitrary seizures and searches." Wayne R. LaFave, 1 Search & Seizure § 1.4(f) (6th ed. West 2022). It may be time to revisit the legitimacy of pretextual stops and the wisdom of *Whren* as a matter of state constitutional law. See Abby M. Fink, *The Long Road to Justice: Why State Courts Should Lower the Evidentiary Burden for Proving Racialized Traffic Stops and Adopt the Exclusionary Rule as a Remedy for Equal Protection Violations*, 13 Wash. J. Soc. & Env't Just. 1 (2023). Only a few short years ago, the Illinois Supreme Court recognized that "[p]eople of color have no less expectation of fairness, equity and freedom from racial discrimination than others, yet they are continually confronted with racial injustices that the Courts have the ability to nullify and set right." Illinois Supreme Court, *Supreme Court Release Statement on Racial Justice, Next Steps for Judicial Branch* (June 22, 2020). I suggest starting with *Whren*.